## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| EAGLE EQUITY FUNDS, LLC, AHG VERMOGENSVERWALTUNGSGESELLSCHAFT MB, AND AAE MANAGEMENT FOR ENERGY EQUIPMENT LLC, | ) ) ) ) |
| | ) Case No. |
| Plaintiffs, | ) |
| | ) **COMPLAINT FOR** |
| v. | ) **VIOLATIONS OF FEDERAL** |
| | ) **SECURITIES LAWS** |
| CENTRAIS ELÉTRICAS BRASILEIRAS S/A – ELETROBRAS,WILSON PINTO FERREIRA, JR., AND ELVIRA BARACUHY CAVALCANTI PRESTA, | ) **JURY TRIAL DEMANDED** ) ) |
| | ) |
| Defendants. | ) |
| | ) |
| | ) |

Plaintiffs Eagle Equity Funds, LLC ("Eagle"), AHG Vermogensverwaltungsgesellschaft MB ("AHG"), and AAE Management for Energy Equipment LLC ("AAE") (collectively, "Plaintiffs"), through their undersigned counsel, allege the following on information and belief, including the investigation of counsel and review of publicly-available information, except as to those allegations pertaining to Plaintiffs and their agents, which are alleged on personal knowledge:

### NATURE OF THE ACTION

1.      This action is brought by Plaintiffs against Defendants Centrais Elétricas Brasilerás S/A – Eletrobrás ("Eletrobras" or "the Company"), Wilson Pinto Ferreira, Jr. ("Ferreira"), and Elvira Baracuhy Cavalcanti Presta ("Presta") (collectively, "Defendants") under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a); Securities and Exchange Commission ("SEC") Rule 10b-5, 17 C.F.R.

§ 240.10b-5; 28 U.S.C. § 2201; and applicable state law.

2.    This action arises from false and/or misleading statements and/or omissions of material facts made by Defendants in Eletrobras' SEC filings regarding Eletrobras' obligations under certain Bearer Bonds and Compulsory Loan Credits (as defined below) (collectively, the "Compulsory Loan Obligations") that were issued by Eletrobras under Brazil's compulsory loan program (the "Compulsory Loan Program").

3.    Plaintiffs are Eletrobras shareholders and the holders of 694 of the Bearer Bonds issued by Eletrobras ("Plaintiffs' Bonds," as defined below), all convertible into shares if they are not paid by the contracted maturity date, as recorded in the shareholders' meeting that preceded each bond issuance and as reflected in the Brazilian notarial records.  Plaintiffs' Bonds are worth more than U.S. $5.2 billion. In addition to those bonds held by Plaintiffs, upon information and belief, there are hundreds (if not thousands) of similar, outstanding Bearer Bonds and Compulsory Loan Credits currently in existence, the value of which exceeds several billion dollars. By comparison, and importantly, as of the date of the filing of this Complaint, Eletrobras' total market value is just U.S. $12.1 billion.

4.    As outlined below in considerable detail, in recent years many of Brazil's partially state-owned companies have been embroiled in what has been described as the largest fraud ever perpetrated in Brazil and, possibly, the world.  In May 2018, Eletrobras (one of those partially state-owned companies) settled a securities class action previously pending in this district in connection with its involvement in that fraud for $14.75 million.

5.    Through this action Plaintiffs seek to stop Defendants from perpetrating yet another massive, ongoing fraud on American and international investors, pursuant to which Defendants are (a) falsely misstating and underreporting Eletrobras' liabilities in connection with its

Compulsory Loan Obligations, (b) thereby falsely reducing the value of the Bearer Bonds and Compulsory Loan Credits and correspondingly falsely inflating the value of Eletrobras' common and preferred stock and American Depositary Receipts ("ADRs"), (c) making it impossible for all of Eletrobras' securities holders to accurately value their securities, and (d) thereby harming all of Eletrobras' security holders. To this end, Plaintiffs seek to enjoin Defendants from continuing to make false and/or misleading statements and/or omissions of material facts regarding Eletrobras' Compulsory Loan Obligations, including the validity or enforceability of the Bearer Bonds, most notably in connection with the imminent privatization of Eletrobras (hereinafter, the "Privatization"), which will involve the sale of billions of dollars in stock to American and international investors.[1]

6.     Despite Eletrobras' demonstrated obligations under the Compulsory Loan Program, Eletrobras has taken the position in its SEC filings that the Bearer Bonds are unenforceable and that its liabilities under the Compulsory Loan Credits are limited. As a result, in Eletrobras' financial statements and in representations to the market – including its most recent Form 20-F Annual Report for the year ended December 31, 2018 (filed on April 30, 2019) (the "2018 Annual Report")[2] – *Defendants completely omit billions of dollars owed under the Bearer Bonds from Eletrobras' balance sheet liabilities*, fail to even recognize them as contingent liabilities, and downplay and minimize billions of dollars more in obligations under the Compulsory Loan Credits. For a company that has a market cap of approximately U.S. $12 billion, these omissions and misrepresentations are especially material *as these liabilities amount to more*

---

[1]     All emphases added unless otherwise noted.

[2]     SEC Form 20-F is the primary disclosure document used by foreign private issuers who have shares traded on a U.S. exchange (such as the New York Stock Exchange). Form 20-F is filed as an annual report, as well as to register classes of securities.

3

*than one-third the entire value of the Company*.

7.      The misrepresentations and omissions with respect to the Bearer Bonds are all the more egregious in light of the fact that in 2015, PriceWaterhouse Coopers ("PwC") issued a report (the "PwC Report") finding that Eagle's claims under the Bearer Bonds were "possible" and that the amount Eagle was seeking under the Bearer Bonds needed to be included in Eletrobras' liabilities. Yet, it was not.

8.      What is worse, Eletrobras continues to stubbornly maintain its unsupportable position despite *multiple judicial rulings to the contrary*. By way of most recent example only, in a June 12, 2019 landmark ruling from the Brazilian Superior Tribunal de Justiça (the "STJ")[3] (Special Appeal No. 790288/PR) (the "2019 STJ Decision"), the STJ found in favor of a creditor of an Eletrobras Compulsory Loan Credit, holding that for all Compulsory Loan Credits that have not been converted into shares, Eletrobras must pay interest of 6% per year plus monetary (inflationary) adjustment up to the date of effective payment or conversion, and rejected Eletrobras' position (as reflected in its financial statements and public filings) that interest only accrued until June 30, 2005. This means that Eletrobras has unreported liabilities related to its Compulsory Loan Obligations that extend into the billions of dollars.

9.      Nevertheless, in a June 12, 2019 Market Announcement (which was subsequently filed with the SEC on Form 6-K on June 13, 2019) (the "June 12 Market Announcement") to specifically address the 2019 STJ Decision, **Defendants stated that they would essentially ignore the decision and that Eletrobras would continue to provision the same amounts for its Compulsory Loan Obligations, in direct contravention of the STJ's holding.**

10.     Consistent with Defendants' reckless and knowingly improper and illegal position,

---

[3]     The STJ is Brazil's highest court of appeals for all non-constitutional matters.

in Eletrobras' August 14, 2019 Marketletter on Form 6-K (the "2Q19 Marketletter") and September 2, 2019 Amended Marketletter (the "Amended 2Q19 Marketletter"), no changes were made to Eletrobras' balance sheet to reflect the STJ's then-recent Decision or the effect it should have on Eletrobras' reporting of its Compulsory Loan Obligations. **Instead, the 2Q19 Marketletter completely omitted any mention of the 2019 STJ Decision.** And on September 2, 2019, when the formal 2019 STJ Decision was published, Defendants issued another Market Announcement (which was filed with the SEC on Form 6-K on September 2, 2019) (the "September 2 Market Announcement") reiterating that they did not intend to change the way Eletrobras was reporting its Compulsory Loan Obligations.

11.     Defendants' refusal to accurately report Eletrobras' Compulsory Loan Obligations – and the materially false and/or misleading statements and/or omissions of material facts that they have knowingly and/or recklessly made in furtherance thereof – are causing ongoing damage to all Eletrobras securities holders by (a) falsely misstating and underreporting Eletrobras' liabilities in connection with its Compulsory Loan Obligations, (b) thereby falsely reducing the value of the Bearer Bonds and Compulsory Loan Credits and correspondingly falsely inflating the value of Eletrobras' common and preferred stock and ADRs, and (c) making it impossible for all of Eletrobras' securities holders to accurately value their securities.

12.     That harm is compounded and accentuated by the fact that the Brazilian government is in the final stages of planning for the Privatization of Eletrobras, which is expected to take place in early 2020. As has been widely reported, the Privatization will involve **the issuance of millions of new shares of Eletrobras stock** in order to reduce the controlling stake of the

5

government of Brazil.[4]  Issuance of shares is expected to be registered on the New York Stock Exchange ("NYSE"), where Eletrobras' ADRs already trade. <u>The Privatization is expected to yield as much as U.S. $4.4 billion in proceeds.</u>

13.     Based on Eletrobras' prior, consistent, and repeated statements contained in its SEC filings, including the 2018 Annual Report, the statements made in the June 12 and September 2 Market Announcements that Eletrobras intends to ignore the 2019 STJ Decision, and the 2Q19 and Amended 2Q19 Marketletters, it is expected that, in connection with the Privatization, Defendants will file a Form 6-K, Form 20-F, Form F-3,[5] or other required documents with the SEC containing the same or similar false and/or misleading statements and/or omissions of material facts regarding Eletrobras' multi-billion dollar Compulsory Loan Obligations as they have previously made. In light of Eletrobras' recent corporate history of securities fraud and corruption, it must not be allowed to perpetrate another massive, ongoing fraud on the investing public, nor should it be allowed to falsely devalue the Bearer Bonds and Compulsory Loan Credits and falsely inflate the value of its stock by continuing to falsely and misleadingly misrepresent and underreport its Compulsory Loan Obligations.

14.     For these reasons and as set forth in detail herein, Plaintiffs seek to permanently enjoin Defendants from:

a.     Continuing to make false and/or misleading statements and/or omitting material facts necessary to reveal the truth in Eletrobras' SEC filings and public statements regarding Eletrobras' Compulsory Loan Obligations, including the validity or

---

[4]     The Brazilian government currently owns approximately 51% of Eletrobras' common stock.

[5]     SEC Form F-3 is a form used by certain foreign private issuers for the registration of certain securities.

enforceability of the Bearer Bonds;

b.   Filing a Form 6-K, Form 20-F, Form F-3, or any other documents with the SEC in connection with the upcoming Privatization that contains false and/or misleading statements and/or omits material facts necessary to reveal the truth regarding Eletrobras' Compulsory Loan Obligations, including the validity or enforceability of the Bearer Bonds; and

c.   Filing any documents at all with the SEC until Defendants correct in Eletrobras' prior SEC filings the false and/or misleading statements and/or omissions of material facts necessary to reveal the truth regarding Eletrobras' Compulsory Loan Obligations, including the validity or enforceability of the Bearer Bonds.

In addition, Plaintiffs also seek a declaratory judgment that:

d.   Defendants' statements in Eletrobras' prior SEC filings regarding Eletrobras' Compulsory Loan Obligations, including the validity or enforceability of the Bearer Bonds, are false and/or misleading and/or omit material facts; and

e.   The Bearer Bonds are valid and enforceable obligations.

Finally, Plaintiffs request that the Court:

f.   enter a judgment against Eletrobras in the amount due under the Bearer Bonds to Plaintiffs, in addition to damages.

## <u>JURISDICTION AND VENUE</u>

15.   This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act, 15 U.S.C. §78aa, 28 U.S.C. § 1331 (federal question jurisdiction), and 28 U.S.C. § 1337 (commerce), as Plaintiffs allege violations of Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b), 78t(a), and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R.

§ 240.10b-5), as well as seek a declaratory judgment under 28 U.S.C. § 2201. This Court also has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367, as they form part of the same "case or controversy" as the federal claims.

16.     Personal jurisdiction exists over Defendants because they either (a) conduct business in or maintain operations in this District, or (b) are either present in this District for jurisdictional purposes or have sufficient minimum contacts with this District as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice. More specifically, Eletrobras' ADRs are listed and traded on the NYSE, which is headquartered in this District. In addition, Presta signed the June 12 Market Announcement, the September 2  Market Announcement, the 2Q19 Marketletter, the Amended 2Q19 Marketletter, the 2018 Annual Report, and the Sarbanes-Oxley Certification for the 2018 Annual Report, and Ferreira signed the Sarbanes-Oxley Certification for the 2018 Annual Report. Further, a nonresident defendant sued under the Exchange Act need not have minimum contacts with the state seeking to exercise personal jurisdiction; rather, the only contacts required are with the United States as a whole, because of the nationwide service of process provision. *See re Longfin Corp. Sec. Class Action Litig.*, 18cv2933, 2019 U.S. Dist. LEXIS 62758, at \*23 (S.D.N.Y. Apr. 11, 2019) (citing *U.S. Titan, Inc. v. Guangzhou Zhen Hua Shipping Co.*, 241 F.3d 135, 152 n.12 (2d Cir. 2001)); *see also Sec. Inv'r Prot. Corp. v. Vigman*, 764 F.2d 1309, 1315-16 (9th Cir. 1985).

17.     Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as under 28 U.S.C. § 1391(b) and (c), because Defendants are found, or are inhabitants or transact business, in this District, and because a substantial part of the conduct complained of herein occurred in this District. More specifically, Eletrobras' ADRs are listed and traded on the NYSE, which is headquartered in this District. *See, e.g., United States v. Svoboda*,

347 F.3d 471, 484 n.13 (2d Cir. 2003) (collecting cases).

18.     Defendants are not immune from suit in the United States under the Foreign Sovereign Immunities Act, as this lawsuit is based upon a commercial activity carried on in the United States by Defendants, an act performed in the United States in connection with a commercial activity of Defendants elsewhere, and/or an act performed outside the United States in connection with a commercial activity by Defendants that caused a direct effect in the United States. *See* 28 U.S.C. § 1605(a)(2).

## PARTIES

I.     PLAINTIFFS

19.     Eagle Equity Funds, LLC (previously defined as "Eagle") is a limited liability company organized and existing under the laws of the state of Delaware. Its sole Member and Operating Manager is Édison Freitas de Siqueira. Mr. de Siqueira is a citizen of Brazil.

20.     AHG Vermogensverwaltungsgesellschaft MB (previously defined as "AHG") is a corporation organized and existing under the laws of Germany. Its Managing Director and Owner is Hartmut Günter.  Mr. Günter is a citizen of Germany.

21.     AAE Management for Energy Equipment LLC (previously defined as "AAE") is a limited liability company organized and existing under the laws of Abu Dhabi, United Arab Emirates, by Eagle, Mr. Günter and Sheik Mohammed Abdulla al Mazroui. Mr. Mazroui is a citizen of the United Arab Emirates.  AAE controls Eagle and AHG's assets and investments, and is managed by Mr. Mazroui, Chief Executive Officer, Mr. Gunter, Chief Financial Officer, and Mr. de Siqueira, Chief Executive Officer – Legal.

22.     Plaintiffs are the holders of:

    a.    2,937 Eletrobras ADRs (1,000 AAE, 1,000 AHG, and 937 Eagle), which represent

approximately 2,937 shares of Eletrobras common stock; and

b. 694 Bearer Bonds issued by Eletrobras within the following series: A, B, D, E, F, H, I, J, M, N, P, Q, R, S, T, V, X, AA, BB, DD, FF, and HH.

## II.   DEFENDANTS

23.     Defendant Centrais Elétricas Brasileiras S/A – Eletrobrás (previously defined as "Eletrobras" or "the Company") is a semi-public corporation organized and existing under the laws of the Country of Brazil. It maintains its principal executive offices in Rio de Janeiro, Brazil. Eletrobras' securities trade in the United States. Eletrobras' ADRs are registered with the SEC pursuant to Section 12(b) of the Exchange Act and trade on the NYSE. The Company's ADRs representing common shares trade under the symbol "EBR," and its ADRs representing preferred shares trade under the symbol "EBR.B." In addition, the Company has issued multiple tranches of bonds with maturity dates throughout the next few years. Eletrobras regularly files quarterly and year-end annual reports with the SEC. Eletrobras also files signed certifications by its senior-most officers pursuant to the U.S. Sarbanes-Oxley Act, 15 U.S.C. §§ 7201 *et seq.*, that purport to attest to the truth, accuracy, and reliability of the Company's financial statements and material representations.

24.     Defendant Wilson Pinto Ferreira, Jr. (previously defined as "Ferreira") is the Chief Executive Officer of Eletrobras. On information and belief, Ferreira is a citizen of Brazil. Ferreira signed the Sarbanes-Oxley Certification for the 2018 Annual Report.

25.     Defendant Elvira Barachuy Cavalcanti Presta (previously defined as "Presta") is the Chief Financial Officer and Chief Investor Relations Officer of Eletrobras. On information and belief, Presta is a citizen of Brazil. Presta signed the June 26 Form 6-K, August 14 Form 6-K, September 2 Form 6-K, 2018 Annual Report, and the Sarbanes-Oxley Certification for the 2018

Annual Report.

26.     Collectively, Ferreira and Presta are referred to herein as the "Individual Defendants," and Eletrobras, Ferreira, and Presta are referred to herein as "Defendants."

27.     Because of the Individual Defendants' positions, they had access to the information about Eletrobras' liabilities in connection with its Compulsory Loan Obligations and the financial reporting thereon through access to internal corporate documents, conversations, and contact with other corporate officers and employees, attendance at meetings, and reports and other information provided to them. Each of the Individual Defendants, by virtue of his or her high-level position, was directly involved in the day-to-day operations of Eletrobras at the highest levels and was privy to confidential information concerning the Company and its business, operations and practices, including the accounting misstatements alleged herein. The Individual Defendants' positions of control and authority as officers and/or directors enabled them to control the content of the SEC filings, press releases, and other public statements of Eletrobras outlined above. Accordingly, each of the Individual Defendants bears responsibility for the accuracy of the SEC filings, press releases, and other public statements detailed herein, and is liable for the misrepresentations and omissions contained therein.

28.     During the relevant time period, each of the Individual Defendants substantially participated in, and had exclusive authority and control over, the content of the Company's false and/or misleading statements, financial statements, and how those results were communicated to investors. Individual Defendants also engaged in conduct in furtherance of a fraudulent scheme and course of business and were involved in the preparation and dissemination of Eletrobras' false financial statements, all of which made it necessary or inevitable that material misrepresentations and the false results of Defendants' scheme would be communicated to, and mislead, investors.

29.     The Individual Defendants were obligated to refrain from falsifying Eletrobras' books, records and accounts, and were prohibited from using the instrumentalities of interstate commerce or the mails to: (i) employ any device, scheme, or artifice to defraud; (ii) make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (iii) engage in any act, practice, or course of business that operates or would operate as a fraud upon any person. Defendants' conduct violated the Exchange Act and SEC regulations promulgated thereunder in connection with the purchase or sale of Eletrobras securities.

30.     Each of the Defendants is a participant in a fraudulent scheme and course of business whose primary purpose and effect was to operate as a fraud and deceit on purchasers of Eletrobras securities by disseminating materially false and/or misleading statements and/or concealing material adverse facts about Eletrobras' financial condition. Defendants' scheme deceived the investing public regarding Eletrobras' financial statements and the intrinsic value of Eletrobras' securities, enabled the Company to register for sale and sell billions of dollars in Eletrobras securities through long term debt offerings, and caused Plaintiffs to be damaged as a result of their purchase of Eletrobras securities.

31.     The Company's press releases and SEC filings were group-published documents, representing the collective actions of Company management. The Individual Defendants directly participated in the management of the Company, were directly involved in the day-to-day operations of the Company at the highest levels, and were privy to confidential proprietary information concerning the Company and its business, operations, financial statements, and financial condition, as alleged herein. The Individual Defendants were involved in drafting, producing, reviewing, and/or disseminating the false and/or misleading statements and information

12

alleged herein, were aware, or recklessly disregarded, that the false and/or misleading statements were being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

32.     The Individual Defendants were able to and did control and monitor the content of the various SEC filings, press releases and other public statements pertaining to the Company during the relevant time frame. Each Individual Defendant was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance, or cause them to be corrected. Accordingly, each Defendant is responsible for the accuracy of the public reports and releases detailed herein, and is therefore primarily liable for the representations contained therein.

## SUBSTANTIVE ALLEGATIONS

I.    **RELEVANT BACKGROUND**

     A.    **Corporate Background**

33.     Eletrobras is an energy corporation headquartered in Rio de Janeiro, Brazil. It was founded in 1962 and is the country's dominant electrical utility company. Eletrobras generates approximately 31% of Brazil's total electricity and its transmission networks comprise approximately 49% of the country's total transmission capacity.

34.     The primary regulator of Eletrobras and the Brazilian power industry is the Ministry of Mines and Energy (the "MME"). Additionally, the Agência Nacional de Energia Elétrica ("ANEEL") regulates and supervises the power industry in accordance with the dictates of the MME and the Brazilian government.

35.     The Brazilian government is Eletrobras' controlling shareholder. The Brazilian government holds the majority of Eletrobras' voting shares – currently, approximately 51% – and

appoints eight (of the eleven) members of Eletrobras' Board of Directors, with seven of those being appointed by the MME and one appointed by the Ministry of Economy. As a result of the majority of Eletrobras' Board being appointed by the Brazilian government, the President of Brazil and his or her governing party have the power to both appoint directors and, indirectly, choose the members of Eletrobras' Executive Board. Upon information and belief, the Brazilian government has consistently exercised this right, appointing, among others, Defendant Ferreira to Eletrobras' Board of Directors, which appointed Defendants Ferreira and Presta to the Executive Board.

36.     The Brazilian government also controls several minority shareholders of Eletrobras. For example, the government of Brazil controls the National Bank for Economic and Social Development (BNDES) and its investment arm, BNDESPar, which together own 18.72% of the total capital of Eletrobras.

**B.     Brazil's Recent Culture of Rampant Economic, Political, and Judicial Corruption**

37.     From 2002 until 2016, Brazil's governing party was the Worker's Party (the "PT"), which was headed by President Lula da Silva (from 2003-2010) and President Dilma Rousseff (from 2011 until August 2016). Prior to her tenure as President, President Rousseff was the Chairperson of the Board of Directors of the state-run oil company Petróleo Brasileiro S.A. ("Petrobras") from 2003 to 2010 and was in charge of the MME from 2003 to 2005.[6] As noted below, in August of 2016, Rousseff was removed from office in the midst of a massive corruption scandal and was replaced by her Vice President, Michel Temer.

38.     In March 2014, a Brazilian criminal money laundering investigation dubbed

---

[6]     Like Eletrobras, Petrobras' controlling shareholder is the Government of Brazil. Indeed, as recently as October 1, 2019, Electrobras confirmed in a Form 6-K, in connection with the disclosure of a related transaction with Petrobras, that it and Petrobras both continue to have the same majority shareholder.

"Operation Car Wash" ("Operação Lava Jato") became public. As a result of this investigation, it was ultimately revealed that a number of Brazil's governing political parties – and especially the PT and its partner in the coalition governments formed by the Lula and Rousseff administrations, the Party of the Brazilian Democratic Movement (the "PMDB") – had been engaged in a massive, multi-billion dollar kickback scheme. Pursuant thereto, (a) Brazil's senior elected officials and members of Brazil's governing parties appointed directors and/or executives at some of Brazil's largest majority-state owned corporations, (b) those directors and/or executives then agreed to overpay on large construction contracts executed by the corporations with members of cartels that included the largest construction contractors in Brazil, (c) the contractors then diverted a portion of those overpayments into secret slush funds run by the same directors and/or officers, and (d) those directors and/or officers then used those secret slush funds to divert the money back to the politicians who had appointed them in the first place and their respective political parties. Needless to say, these same officers and directors also misappropriated tens or hundreds of millions of dollars of kickback payments to themselves and their family members.

39.     Ultimately, at Petrobras alone, many billions of dollars were illegally diverted in this manner and, when the dust finally settled, Petrobras announced that it had lost U.S. $17 billion to fraud, corruption, and graft and would have to sell the same amount in assets and postpone investment plans to regain its financial footing. The fraud is generally considered to be the largest ever perpetrated in Brazil and possibly the world.  In early 2018, Petrobras paid U.S. $2.95 billion – the most ever paid in the United States by a foreign securities issuer – to settle a class action lawsuit brought by American investors who suffered massive damages as a result of the corruption at Petrobras. *In re Petrobras Sec. Litig.*, No. 14-cv-9662 (S.D.N.Y.) (Rakoff, J.).

40.     What is more, through the course of the Operation Car Wash investigation – which

remains ongoing – hundreds of individuals in Brazil were arrested; more than 50 members and former members of Brazil's Congress and other major government officials were targeted by prosecutors in criminal investigations – among them the President of the Senate, the Speaker of the Chamber of Deputies (the lower house of Brazil's legislature), President Lula's former Minister of Finance (who served briefly as President Rousseff's chief of staff before being ousted in a separate lobbying scandal), the former Minister of Mines and Energy in President Rousseff's first term, former President Fernando Collor de Mello (who had returned as a senator),[7] and President Lula's former Chief of Staff – and more than 100 people were formally accused of corruption, money laundering, and other financial crimes.

41.     The corruption ultimately reached the highest levels of Brazil's political and judicial branches. Perhaps most notably, former President Lula himself was ultimately arrested and charged with money laundering in connection with Operation Car Wash. Notably, in a desperate attempt to stop him from talking, then-President Rousseff named former President Lula her Chief of Staff, presumably because as a cabinet member Lula would be legally exempt from federal prosecution and could be tried only in the Brazilian Supreme Court. Before that could happen, however, a Brazilian federal judge both blocked Lula's appointment and released a wiretapped phone conversation between Rousseff and Lula which indicated that Rousseff had made the appointment to protect Lula from prosecution.

42.     Unsurprisingly, calls for Rousseff's impeachment soon swelled, with the PMDB's Speaker of the Chamber of Deputies, Eduardo Cunha – who himself had been charged with corruption and money laundering and who was later removed in May 2016 for having obstructed

---

[7]     Collor had been impeached by the Senate in 1992 on corruption charges and disqualified from holding elected office for eight years.

the investigation into corruption charges against himself – leading the charge. As arrests and convictions mounted in both parties (and beyond), in early 2016, the PMDB (headed by Cunha) withdrew from the coalition government it had formed with the PT (under Rousseff) and, by May 2016, the Brazilian Congress voted to suspend President Rousseff and to begin impeachment proceedings. Vice President Temer of the PMDB became the acting President.

43.     Barely two weeks into his own administration, however, Temer's new Planning Minister and a close confidant was forced to step down amid accusations that he, too, had sought to obstruct the Operation Car Wash investigation, and, throughout 2017, acting President Temer was himself accused of passive corruption, criminal organization, and obstruction of justice by the Attorney General's Office. On August 31, 2016, the Brazilian Senate formally convicted and permanently removed former President Rousseff from office.

44.     Shortly thereafter, in July 2017, former President Lula was convicted of corruption and money laundering in connection with Operation Car Wash and sentenced to nine years in prison by Judge Sergio Moro.  Just a few months later, in September 2017, additional charges related to Operation Car Wash were brought against Lula and his successor, Rousseff.

45.     Meanwhile, in mid-2017, President Temer became the subject of additional corruption allegations, as a secretly-recorded taped conversation was released that appeared to show Temer approving an offer of hush money to Cunha to stop him from testifying about millions of dollars in bribes.[8]  Threatened with impeachment himself, Temer refused to resign but ultimately was too injured politically to run for the Presidency.

46.     As the October 2018 presidential election approached, opinion polls showed that

---

[8]     Later, the other person on the recorded tape would testify that Temer had indeed received millions of dollars in bribes.

former President (and now convicted criminal) Lula was the front runner, but he could not run due to his conviction (ironically, because of a law he himself had passed). In January 2018, the appeals court on which Lula had hung his presidential aspirations dealt him a crushing blow, not only affirming his sentence (and guaranteeing that he could not run for President), but also increasing his sentence to more than 12 years. On April 7, 2018, after holing himself up for two days and refusing to turn himself in to serve his sentence, Lula gave an impassioned speech in which he proclaimed his innocence and alleged that his prosecution and conviction were motivated to stop him from running for office again. Lula then turned himself into authorities to serve his sentence. Then, in August 2018 – from prison – former President Lula announced that he had submitted the necessary paperwork to register as the PT's candidate in the upcoming election. Thereafter, Brazil's top electoral court barred Lula from running for re-election because of his corruption conviction in September 2018.

47.     Predictably, without Lula, Jair Bolsonaro instead won the October 2018 presidential election. After Bolsonaro took office, he created a new position of unprecedented authority – referred to by Brazilians as "**super justice minister**" – to oversee an agency with consolidated powers over law enforcement, surveillance, and investigation that had previously been divided among several ministries. Judge Moro was then appointed to this position.

48.     It has since been revealed that Judge Moro – largely seen as a hero in Brazil for heading the Operation Car Wash investigation and speaking truth to power – may have actually been inappropriately communicating with prosecutors about the case for political reasons, including to stop Lula from running for President again.  Cellphone conversations leaked in June 2019 appear to indicate that, during Lula's trials, Judge Moro repeatedly gave the prosecutors strategic advice, criticism, and tips to strengthen their case against Lula, including passing along

the contact information of a witness who could testify against him.[9]

49.    As recently as September 9, 2019, Marcio Lobão, son of the former minister of Mining and Energy and former Eletrobras CEO Edison Lobão, was arrested in connection with a bribery scheme involving Transpetro (a unit of Petrobras) and the Belo Monte power plant.

50.    Ultimately, as of the drafting of this Complaint, more than 400 people have been charged and more than 150 have been convicted of fraud, corruption, money laundering and/or other wrongdoing in connection with Operation Car Wash.  Among those arrested and/or convicted include over 120 politicians, including two presidents of Brazil and four former presidents of Peru, Panama, and El Salvador. Billions of dollars have been, or are yet to be, paid in damages.[10]

C.    **Eletrobras' Involvement in This Ongoing Corporate Fraud**

51.    As one of Brazil's other large majority-state owned corporations, Eletrobras and its management were hardly immune from the same rampant political and judicial corruption. Indeed, in late 2014 and early 2015, as the above facts were unfolding, the Operation Car Wash investigation broadened to encompass Eletrobras, and facts immediately surfaced implicating current and former Eletrobras directors and executives in an similarly massive and strikingly similar corruption scheme. Alberto Youssef, the admitted black market money-launderer at the center of the Petrobras bribery scandal, testified in a deposition that there were fraudulent contracts for consulting and construction with at least four Eletrobras subsidiaries: Centrais Elétricas do Norte do Brasil SA ("Eletronorte"), Furnas Centrais Elétricas S.A. ("Furnas"), Eletrosul Centrais SA, and Itaipu Binacional. Similarly, Paulo Roberto Costa, a former member of Petrobras' senior management who eventually cooperated in Operation Car Wash, testified that ***Eletrobras' Angra***

---

[9]    Judge Moro has not denied the authenticity of the leaked conversations.

[10]    A compendium of the investigations, arrests, and convictions arising out of Operation Carwash is available from Plaintiffs' counsel upon request.

*3 thermonuclear reactor and hydroelectric plants were subject to the same bribery and corruption scheme as plagued Petrobras*. Both Youssef and Costa affirmed that the public bidding process at Eletrobras was, in fact, subject to bid-rigging in favor of cartels, resulting in the overpricing of numerous projects.

52.     In March 2015, the CEO of Brazil's largest construction company, Odebrecht S.A. ("Odebrecht"), and one of the people accused of paying bribes to obtain contracts, testified under oath that a *cartel of ten construction companies paid kickbacks to the PT and PMDB totaling one percent of the value of the contracts they were awarded for construction of Eletrobras' Belo Monte hydroelectric dam*, which, when completed, is expected to be the fourth largest dam in the world by capacity.[11] Further testimony indicated that a similar cartel of builders won a rigged bidding process for contracts to work on Angra 3 in exchange for bribes to Company executives and political parties.

53.     Based on evidence uncovered in Operation Car Wash, an entirely separate investigation called "Operation Electroshock" ("Operação Choque") was announced on April 15, 2015, which focused on corruption at Eletrobras' subsidiary, Eletronorte. That same day, authorities arrested Eletronorte's Assistant Director of Operations for accepting R $4 million in bribes from companies doing business with Eletronorte. During the search of Eletronorte's offices two other Eletronorte employees reportedly attempted to hide or destroy documents related to the investigation. Ultimately, allegations of a bid-rigging and bribery scheme carried out in connection with contracts worth R $2.9 billion for Angra 3, which involved kickbacks being paid to the PT, would reach as high as Eletrobras' then-Chief Generation Officer, the CEO of Eletrobras'

---

[11]     Odebrecht was charged by the U.S. Department of Justice with violations of the Foreign Corrupt Practices Act and pled guilty in December 2016. Under the plea agreement Odebrecht agreed to pay U.S. $4.5 billion in penalties.

subsidiary responsible for Angra 3, Eletrobras Thermonuclear S.A. ("Eletronuclear"), a Senator, and the Minister of Mines and Energy.

54.     In addition, alongside Operation Electroshock, on April 29, 2015, the Brazilian Federal Police commenced "Operation Radioactivity" as part of the Operation Carwash Investigation, which resulted in the imprisonment of a former officer of Eletrobras' subsidiary, Eletronuclear. This former officer was sentenced to 43 years in prison for passive bribery, money laundering, obstruction of justice, tax evasion, and participation in a criminal organization. In addition, on July 6, 2016, the Federal Police commenced "Operation Pripyat," in which the Federal Police served arrest warrants on former officers of Eletronuclear (in addition to other parties). Formal charges of corruption, money laundering, and obstruction of justice were filed against these former officers by the Ministério Público Federal (Federal Prosecution Service) ("MPF") on July 27, 2016.

55.     Shortly thereafter, Brazil's Central Accounting Office, the Tribunal de Contas da União ("TCU"), which audits the procurement and contracting practices of companies partially- or wholly-financed by the Brazilian government, announced probes into the Belo Monte project and into Eletrobras' joint venture SPEs with contractors who had been indicted in Operation Car Wash. On September 21, 2015, the TCU released an 80-page report detailing the results of its inspection of Furnas' management of SPEs that found numerous significant management weaknesses and a lack of controls. The report required certain remedial actions by Furnas and urged that "Eletrobras act in order to strengthen the management of its companies when it comes to monitoring SPEs."

56.     As a result of the foregoing, Eletrobras was forced to launch an internal investigation to determine "whether there are irregularities that violate the law U.S. Foreign

Corrupt Practices Act [of] 1977, the Brazilian anti-corruption Law No. 12,846/2013 and the Code

of Ethics of Eletrobras Companies, on projects in which Eletrobras Companies take part in a

corporate form or as minority shareholder, through special purpose entities." Eletrobras initially

disclosed that the investigation extended to the procurement processes regarding construction of

at least five projects. Subsequently, in September 2015, the internal investigation reportedly

expanded to include four additional projects. According to reports, there were approximately 100

personnel from the legal, accounting, and technology departments, which extended to thousands

of Eletrobras employees, conducting the investigation, as well as outside firms. Those outside

firms included the U.S. law firm Hogan Lovells, the Brazilian law firm WFaria Advogados, and

the global risk management firm Kroll Technology. It has been reported that Eletrobras paid Hogan

Lovells as much as U.S. **$100 million** for its work.

57.     Eletrobras' internal investigation did not conclude until April 2018. In connection

therewith, the Company discovered overcharges related to fraudulent bids arising from cartels and

the payment of bribes that were paid through certain contractors and suppliers hired since 2008.

The financial impacts of these findings were presented in the Company's results for the years

ended December 31, 2014 and December 31, 2015. In addition, R $122.8 million was recognized

as losses from irregularities related to Eletrobras' investment in the SPE Santo Antônio.

58.     What is worse, to this day, Eletrobras candidly admits in its SEC filings that it:

> *[C]annot ensure that we will not become the subject of any new criminal
> or further civil anti-corruption action brought under U.S. or Brazilian
> laws if any further illegal acts or regulatory failures come to light*. Any
> potential future anti-corruption-related action could result in charges against
> us or members of our management, significant fines and penalties, civil
> damages, reputational harm, distraction from our ongoing business and
> other unforeseen material adverse effects.
>
> Although our financial statements reflect our best knowledge of the facts,
> *as the Lava Jato Investigation is ongoing and the MPF may take*

> *considerable time to conclude its investigations, new relevant information may come to light and if the findings lead to the identification of materially significant differences in the amounts recorded in our balance sheet, we may have to restate our financial statements, which may have a negative impact on the market value of our securities*. Further, there may be further investigations related to Lava Jato and related proceedings, including, but not limited to, ***ongoing administrative actions related to Angra III and Belo Monte***.

(2018 Annual Report, p. 21.)

59.     Indeed, in the same filing, Eletrobras admits that its 2016 implementation of new compliance measures has <u>not</u> actually brought it into compliance, noting that the objective of these measures is to "strength[en] our internal controls" and "seek[] to achieve compliance with legal and regulatory standards."  (*Id.* at 91.)

60.     As a result of accounting issues connected to this wrongdoing and these internal investigations, Eletrobras was unable (or unwilling) to timely file its 2014 and 2015 annual reports (on Form 20-F) and, as a result, the NYSE suspended trading in Eletrobras' ADRs and commenced de-listing procedures.[12] What is more, ***as a result of the investigation, Eletrobras was forced to acknowledge that it did not have adequate internal controls***.

61.     As these events unfolded, not surprisingly, securities fraud claims were brought against Eletrobras and certain of its directors and officers in the United States in mid-2015 as well. Ultimately, with the undersigned law firm representing the class of wronged investors, Eletrobras agreed to settle the securities fraud claims against it for U.S. **$14.75 million** in May 2018.

62.     Shortly thereafter, in December 2018, Eletrobras agreed to pay an additional U.S. $2.5 million in civil penalties in a settlement with the SEC for "inadequate internal controls" and violations of the Foreign Corrupt Practices Act in connection with Operation Carwash (the "SEC

---

[12]     Trading resumed on October 12, 2016, after Eletrobras finally filed its 2014 and 2015 annual reports on Form 20-F.

Settlement").

63.     In connection with the SEC Settlement, the SEC issued an Order requiring Eletrobras to "cease and desist from committing or causing any violations and any future violations of Sections 13(b)(2)(A) and 13(b)(2)(B) of the Securities Exchange Act of 1934 [15 U.S.C. §§ 78m(b)(2)(A) and 78m(b)(2)(B)]."

64.     Nonetheless, Eletrobras' "inadequate internal controls" persist to this day. Indeed, on pages 12-13 of its most recent 2018 Annual Report (filed April 30, 2019), Eletrobras candidly admits:

> Risks Relating to our Company
>
> If we do not remedy the material weakness in our internal controls, the reliability of our financial statements may be materially affected.
>
> * * *
>
> During the 2018 certification process, *we and our independent auditor conducted independent tests and identified inconsistencies in our internal controls, which resulted in one material weakness included in our 2018 annual report* filed on Form 20-F.
>
> The material weakness identified was:
>
> *As in previous years, we did not maintain adequate controls regarding the preparation of our financial statements and related disclosures.* The matters involved: (i) insufficient involvement of trained personnel on a timely basis, including at relevant subsidiaries; (ii) ineffective general information technology controls (GITC) regarding management and monitoring of privileged accesses; and (iii) *ineffective management review and/or processes level controls over the financial reporting*, where: (a) for continued operations, adoption of IFRS 9 and 15 standards on transmission operations; contingencies, fixed assets, impairments of assets and related accounts; and (b) for discontinued operations, contingencies; accounts payable; accounts receivable; revenue; taxes, and related accounts; *were not designed or operating at a sufficient level of precision to identify material misstatements*.

65.     As outlined below, in light of these ongoing failures to maintain adequate internal controls over its financial accounting, Eletrobras' financial statements continue to be plagued by

false and/or misleading information and/or omissions of material facts – this time regarding Eletrobras' Compulsory Loan Obligations.

## II. THE COMPULSORY LOAN PROGRAM

### A. Issuance of Bearer Bonds and Creation of Compulsory Loan Credits

66.    On November 28, 1962, the Government of Brazil passed Law No. 4,156/62 which required certain end-users of electricity to make "compulsory loans" (the "Compulsory Loan") to Eletrobras through the payment of a specified percentage of each electricity invoice, in order to generate funds for the expansion of Brazil's electricity sector.

67.    During the first phase of the Compulsory Loan Program (the "First Phase"), which lasted until 1976, Eletrobras issued bearer bonds (the "Bearer Bonds") to consumers for their credits.[13] The Bearer Bonds issued by Eletrobras in the First Phase of the Compulsory Loan Program are set forth in the following chart:

---

[13]    In Portuguese the Bearer Bonds are referred to as "Obrigações da Eletrobras."

| BOND SERIES[14] | SHAREHOLDER APPROVAL | NOTARIAL REGISTRATION | ISSUANCE |
|---|---|---|---|
| A | 01/14/65 | 04/07/65 | 04/22/65 |
| B | 01/14/65 | 04/07/65 | 04/22/65 |
| C | 01/14/65 | 04/07/65 | 04/22/65 |
| D | 06/11/66 | 08/08/66 | 08/25/66 |
| E | 06/11/66 | 08/08/66 | 08/25/66 |
| F | 06/11/66 | 08/08/66 | 08/25/66 |
| G | 06/11/66 | 08/08/66 | 08/25/66 |
| H | 03/10/67 | 07/07/67 | 09/12/67 |
| I | 03/10/67 | 07/07/67 | 09/12/67 |
| J | 03/10/67 | 07/07/67 | 09/12/67 |
| L | 03/10/67 | 07/07/67 | 09/12/67 |
| M | 12/10/68 | 03/19/69 | 03/19/69 |
| N | 12/10/68 | 03/19/69 | 03/19/69 |
| O | 12/10/68 | 03/19/69 | 03/19/69 |
| P | 02/21/69 | 05/05/69 | 05/05/69 |
| Q | 02/21/69 | 05/05/69 | 05/05/69 |
| R | 02/21/69 | 05/05/69 | 05/05/69 |
| S | 05/14/70 | 06/30/70 | 07/30/70 |
| T | 05/14/70 | 06/30/70 | 07/30/70 |
| U | 05/14/70 | 06/30/70 | 07/30/70 |
| V | 04/20/71 | 06/02/71 | 11/16/71 |
| X | 04/20/71 | 06/02/71 | 11/16/71 |
| Z | 04/20/71 | 06/02/71 | 11/16/71 |
| AA | 04/26/72 | 06/16/72 | 06/16/72 |
| BB | 04/26/72 | 06/16/72 | 06/16/72 |
| CC | 04/26/72 | 06/16/72 | 06/16/72 |
| DD | 05/08/73 | 06/14/73 | 06/20/73 |
| EE | 05/08/73 | 06/14/73 | 06/20/73 |
| FF | 05/08/73 | 06/14/73 | 06/20/73 |
| GG | 05/08/73 | 06/14/73 | 06/20/73 |
| HH | 03/13/74 | 04/24/74 | 05/22/74 |
| II | 03/13/74 | 04/24/74 | 05/22/74 |
| JJ | 03/13/74 | 04/24/74 | 05/22/74 |
| LL | 03/13/74 | 04/24/74 | 05/22/74 |

68.     As set forth in more detail below, the 694 Bearer Bonds at issue in this lawsuit were issued during the First Phase of the Compulsory Loan Program.

---

[14]     No "K," "W," "Y," or "KK" series were issued.

69.     The Bearer Bonds all provide that Eletrobras owes the bearer(s) the face value of the Bonds plus interest. For Series A through L, the Bearer Bonds provided for a ten-year redemption period and interest in the amount of 12%, and for Series M through L, a twenty-year redemption period and interest in the amount of 6%.

70.     With regard to redemption, Resolution 109 of the Central Bank of Brazil, which applies to all debentures issued by a corporation that guarantee the right to convert them into shares (like the Bearer Bonds, as discussed below), provides that "[t]he debenture convertible in shares represents a liability to make payment, in cash, by the issuer company, on its maturity due date, with the option to convert those into shares resting exclusively with the debenture holders." Resolution 109 further provides that <u>"[t]he exercise of the right to convert into shares is guaranteed to the holders of the convertible debentures, at any time</u> . . . ."

71.     At the Eletrobras shareholders' meetings that approved the issuance of the Bearer Bonds, it was established that the cash settlement of each security should take place at maturity, with the contractual interest described and with monetary adjustment. "Monetary adjustment," which is sometimes also referred to as "monetary correction" or "monetary restatement," means adjustment for inflation.  From the 1960s forward, the Brazilian government enacted a large number of laws and regulations in various segments of the economy providing for monetary restatement of obligations because of the country's high inflation rates, which sometimes exceeded 100% per year.  The amount of the monetary adjustment is based upon the official inflation for the pertinent time period, so it varies over time.

72.     In Decree Law No. 1512/76, the legislature provided that the Compulsory Loan Credit "shall be monetarily adjusted, pursuant to Article 3, of Law No, 4,357 . . . for the purpose of calculating interest and redemption."  Law No. 4,537, Article 3 provides for the <u>mandatory</u>

monetary adjustment of all "fixed assets of legal entities" in order to account for inflation. Moreover, pursuant to a 2009 STJ decision (STJ Special Appeal No. 1.003.955/RS) (the "2009 STJ Decision"), later confirmed by the 2019 STJ Decision, **Eletrobras must pay 6% interest plus default interest based on the SELIC rate**[15] **(as opposed to just a monetary adjustment) for all Compulsory Loan Obligations that had not been converted into shares up to the date of effective payment** (or conversion into shares).

73.     The First Phase of the Compulsory Loan Program ended on December 28, 1976 with the enactment of Law No. 1,512/76, which discontinued the issuance of Bearer Bonds. During the second phase of the Compulsory Loan Program (the "Second Phase"), between 1976 and 1993 (when the Compulsory Loan Program ended), Bearer Bonds were no longer issued by Eletrobras to taxpayers for their credits; rather, credits (the "Compulsory Loan Credits") were recorded in book entry form by Eletrobras.[16]

74.     Law No. 7,181/83 set December 31, 1993 as the deadline for collection of the Compulsory Loan by Eletrobras. That law also provided that the Compulsory Loan Credits could, subject to shareholder approval, be repaid by Eletrobras in the form of an issuance of preferred shares of stock at book value in lieu of cash. As set forth below, the majority of the Compulsory Loan Credits from the Second Phase have been converted into preferred B Eletrobras shares.

B.     <u>The Notarial Registration of the Bearer Bonds by Eletrobras</u>

75.     Brazilian law requires publicly-traded companies issuing bonds that will be

---

[15]     SELIC, which stands for Sistema Especial de Liquidação e de Custódia, is the Brazilian Central's Bank's overnight rate.

[16]     During the Second Phase, the Compulsory Loan was only collected from industrial customers with a certain minimum level of electricity consumption.

circulating abroad to register the bonds in the Notarial Office of the Brazil Real Estate registry.[17] **Pursuant to Brazilian law, Registration remains valid until cancellation or termination.[18]**

76.     In accordance with Brazilian law, and as reflected in the chart above, Eletrobras registered the Bearer Bonds in the First and Second Registers of Deeds of the Federal District prior to their issuance.

77.     To date, the registrations of the Bearer Bonds have <u>not</u> been cancelled.

78.     Indeed, in 2013 and again as recently as December 2018, **the Brazilian notarial authorities provided Plaintiffs with official certificates affirming the registrations of the Bearer Bonds** and certifying that the registrations have not been cancelled.

C.     <u>Conversion of Compulsory Loan Credits in Phase Two</u>

79.     During Phase Two of the Compulsory Loan Program, Eletrobras' shareholders authorized four conversions of the Compulsory Loan Credits into preferred B Eletrobras shares.

a.     In the first conversion of Compulsory Loan Credits (formed between 1978 and 1985) on March 29, 1988, which was approved by Eletrobras' shareholders on April 20, 1988, Eletrobras converted Cz $111 billion[19] of the Compulsory Loan Credits to preferred B shares.

b.     In the second conversion of Compulsory Loan Credits (formed during 1986 and 1987) on January 30, 1990, which was approved by Eletrobras' shareholders on April 26, 1990, Eletrobras converted CR $5.576 billion of the Compulsory Loan

---

[17]     Articles 62 and 73 of Law of Companies With Shares; Article 167 of Public Records Act.

[18]     Article 252 of Public Records Act.

[19]     "Cz" means "cruzado." The cruzado was Brazilian's currency from 1986 to 1989. The currency then switched to the "cruzado novo" (NCz$) from January 1989 to March 1990, the "cruzeiro" (Cr$) from 1990 to 1993, the "cruzeiro real" (CR$) from August 1993 to June 1994, and, finally, the "real" (plural,  "reais") (R$) from 1994 to the present.

Credits to preferred B shares.

c.   In the third conversion of Compulsory Loan Credits (formed between 1988 and 2004) on April 28, 2005, which was approved by Eletrobras' shareholders on June 30, 2005, Eletrobras converted R $1.053 billion of the Compulsory Loan Credits to preferred B shares.

d.   And in the fourth conversion of Compulsory Loan Credits (formed from 1998-2004) on April 30, 2008, Eletrobras converted <u>R $202.3 million</u> of the Compulsory Loan Credits to preferred B shares.

80.   As of December 31, 2018, the remaining balance of the Compulsory Loan Credits from the Second Phase that have not yet been converted into preferred shares relates to credits from 1988-1994 in the amount of R $493.1 million (U.S. $122.4 million).

81.   There have been – and continue to be – numerous lawsuits against Eletrobras relating to monetary adjustment of the Compulsory Loan Credits as well as the calculation of interest and other related issues.[20] These lawsuits relate solely to Phase Two of the Compulsory Loan Program and are referred to herein as the "Compulsory Loan Credit Lawsuits."

III.   <u>PLAINTIFFS' BEARER BONDS</u>

A.   <u>Plaintiffs' Purchase of the Bearer Bonds</u>

82.   On May 6, 2008, Eagle purchased 371 Bearer Bonds (the "Eagle Bonds") from Édison Freitas de Siqueira Advogados Associados ("Siqueira Associates") in New York City.[21] Eagle registered the purchase of the Eagle Bonds with the NYSE on July 28, 2008.  Resolution 109 provides that "[a]ll market operations in respect to the debentures that are convertible into

---

[20]   *See infra* ¶¶ 167-170.

[21]   De Siqueira Associates is a Brazilian law firm and partnership. Mr. de Siqueira is the sole manager of de Siqueria Associates.

shares, after the same having been placed with the public, shall be mandatorily performed through Stock Exchanges in those places where these exist."

83.     On May 18, 2009, Mr. Ginel Miranda purchased 323 Bearer Bonds in Santiago, Chile. On November 1, 2013, Mr. Miranda became co-owner of AHG and thereafter transferred these bonds to AHG (the "AHG Bonds").[22] The AHG Bonds were registered for tax reasons in Germany on November 25, 2013. They were also registered with the Notarial Authorities in Brazil on December 9, 2013.

84.     Prior to the purchase of Plaintiffs' Bonds, Eagle and AHG contacted the Notarial Authorities in Brazil regarding the validity of the Bonds and received official certificates certifying that the Bearer Bonds were registered and the registrations had not been cancelled.

85.     As of December 31, 2018, the value of Plaintiffs' Bonds is approximately R $19.95 billion or U.S. $5.15 billion. This breaks down to R $10.21 billion (U.S. $2.64 billion) for AHG, and R $9.74 billion (U.S. $2.51 billion) for Eagle.

86.     Eletrobras has, both in its public pronouncements, financial statements, and SEC filings, as well as in various lawsuits (including those discussed below), consistently and repeatedly disavowed any liability under the Bearer Bonds, maintaining that the Bearer Bonds are invalid and unenforceable.

**B.     Litigation and Related Investigations Regarding the Bearer Bonds**

87.     The validity and enforceability of the Bearer Bonds has been the subject of prior litigation (both by Plaintiffs and third parties),[23] as well as both civil and criminal investigations

---

[22]     The 694 Eagle and AHG Bonds are referred to collectively herein as "Plaintiffs' Bonds."

[23]     Under the Brazilian Code of Civil Procedure (Código de Processo Civil), it is permissible for a party to have a lawsuit pending in both Brazil and a foreign country regarding the same subject matter. C.P.C. art. 24.

in Brazil – all of which have thus far gone nowhere for a number of reasons.

88.     *First,* most Brazilian legal decisions lack precedential effect, such that a decision by one court is often not binding on another, even if the deciding court is an appellate court. With certain limited exceptions, Brazil does not generally recognize the doctrine of *stare decisis*.

89.     *Second*, on information and belief, based on some of Plaintiffs' personal experience, the government of Brazil has intervened in or otherwise influenced some of these lawsuits and investigations to protect Eletrobras – of which it owns a majority stake – from adverse decisions that would have forced it to pay out the billions of dollars in obligations under the Bearer Bonds to which Plaintiffs are rightfully entitled. Regarding the instant action, the conflicts of interest facing the government of Brazil are insurmountable.

90.     By way of example, on July 11, 2013, Eagle filed a monitory process lawsuit against Eletrobras in federal district court in Rio de Janeiro ("TRF-2") (Case No. 2013.51.01.024458-3)[24] (the "Eagle Lawsuit"), seeking: (a) payment under the Eagle Bonds (R $5.256 billion) (or, alternatively, a declaration of Eagle's rights under the Bearer Bonds and conversion of the action into an executory action); and (b) a preliminary injunction to notify the notarial registry to not cancel the registration of the Bonds. Eagle also alleged that Eletrobras had diverted funds allocated in its special reserves for, *inter alia*, payment of the Bearer Bonds to four controlling shareholders by means of an increase in their share capital.

91.     Eagle attached to its Complaint the notarial registrations of the Bearer Bonds, an auditor's report that had been prepared by Sand Accounting ("Sand") (the "Sand Report"), and the

---

[24]     Under Brazilian law, "monitory" is a more expedited proceeding than "ordinary" process and is utilized where, *inter alia*, the plaintiff has the right, on the basis of written evidence, to demand from a debtor the payment of cash or performance of an obligation. The third type of process available in Brazilian courts is "executory" process, which is a summary proceeding utilized to seek execution of a judgment, an executory title, or payment of a liquid and certain debt.

lawsuit filed by Brandes International Equity Fund ("Brandes") against Eletrobras in February 2008 in TRF-2 (No. 2008.001.040420 – 4) (the "Brandes Lawsuit"). The Sand Report, issued in 2008, concluded that **Eletrobras had diverted R $12 billion (U.S. $3.02 billion) that had been in its cash account reserve for the payment of Bearer Bonds to its capital reserve account to increase the company's capital stock, and then transferred the money to the six controlling shareholders of Eletrobras,** who used those amounts to increase their number of shares. In its lawsuit, Brandes, a pension and investment fund that held approximately 8.5% of Eletrobras' shares, alleged that Eletrobras had failed to pay and had **illegally diverted minimum compulsory dividends that should have been paid to stockholders** under Brazilian law and Eletrobras' by-laws to "special reserves of dividends."[25]  Eagle requested that the Court allow it to notify the Comissão de Valores Mobiliarios ("CVM") (the Brazilian equivalent of the SEC), the Federal Prosecutor's Office (previously defined as the "MPF"), and PwC (Eletrobras' independent auditors at the time)[26] about the Eagle Lawsuit, the Sand Report, and the Brandes Lawsuit.

92.     During the Eagle Lawsuit, **the district judge deciding the matter changed <u>five times</u>**.

93.     On October 11, 2013, the <u>first</u> judge (Judge Aline Alves de Melo Miranda Araújo) found that, based on Eagle's Complaint and the documents presented to the Court by Eagle, there was **<u>"probable existence" of the debt under the Bearer Bonds and ordered Eletrobras to pay the amount sought in the complaint within fifteen days of the order</u>**. The Court also granted

---

[25]     Without explanation, the Brandes Lawsuit disappeared from the court's docket after it was filed.

[26]     PwC was Eletrobras' independent auditor through the end of 2013. It was replaced by KPMG as of January 1, 2014. KPMG was then Eletrobras' independent auditor until April 30, 2019, when it was replaced by PwC. On information and belief, PwC is currently Eletrobras' independent auditor.

Eagle's request to notify the MPF and PwC about the Eagle Lawsuit, the Brandes Lawsuit, and the Sand Report, but denied Eagle's request for preliminary injunction because it is not possible for Eletrobras to cancel the notarial registration of the Bearer Bonds.[27]

94.     Eletrobras filed a motion for reconsideration requesting suspension of execution and extinction of the judgment based upon the argument that the Bearer Bonds had prescribed (*i.e.*, that the statute of limitations had expired). Eagle responded to the motion on November 29, 2013, arguing that the statute of limitations could not begin to run until the registrations of the Bearer Bonds are cancelled (which they have not been), that, at any rate, the statute of limitations was tolled by Eletrobras' recognition of the debts, and that the five-year statute of limitations for tax debts was not applicable to the Bearer Bonds.

95.     On February 6, 2014, the MPF, having been served with the Eagle Lawsuit Complaint and its attachments per the order of the Court, referred the matter to the Attorney General for investigation. On March 6, 2014, the MPF found that "in light of the possibility of the perpetration of an act of administrative impropriety on the part of public-sector agents associated with" the four controlling shareholders of Eletrobras, **an investigation should be opened into whether Eletrobras had illegally diverted funds to its controlling shareholders in order to avoid its obligations under the Bearer Bonds** (the "MPF Investigation").

96.     In the interim, on or about August 14, 2014, AHG filed an executory process lawsuit against Eletrobras in TRF-2 (Case No. 0009477-87.2014.4.02.5101) (the "AHG Lawsuit"),

---

[27]     Pursuant to Article 300 of the Brazilian Code of Civil Procedure, a "preliminary injunction will be granted when there are elements evidencing the probability of the right and the irreparable harm or the risk to the useful outcome of the proceedings." Thus, because it was technically not possible to cancel the obligations under the Bearer Bonds, there was no remedy available to the court.

requesting payment on the AHG Bonds.[28] The AHG Lawsuit was dismissed without prejudice on December 19, 2014 because the Court determined that executory process was not the proper procedure and that an ordinary process lawsuit should have been filed instead. AHG filed a motion for reconsideration of the dismissal.

97.     Meanwhile, on June 19, 2015, the second judge suddenly appointed to oversee the Eagle Lawsuit (Judge Luiz Norton Baptista de Mattos) *sua sponte* ordered Eagle to deposit as a bond an amount equivalent to 10% of the total amount in dispute (R $525 million, or approximately **U.S. $250 million**) or prove the existence of assets in Brazil that could assure payment of the same amount, in order for Eagle's claims to proceed. A bond, however, should not have been required under Brazilian law.[29] This draconian and unfair burden placed upon Plaintiffs by the replacement judge who had been inexplicably interjected into the proceeding had the intended effect of preventing Eagle from prosecuting its claims against Eletrobras (and, effectively, the government of Brazil).  Eagle filed a motion for reconsideration of this order.

98.     In the interim, on July 2, 2015, PwC issued an report (the "PwC Report") to Eletrobras' management regarding the claims in the Eagle Lawsuit.[30] Notably, in the Report, PwC

---

[28]     Eagle and AHG filed different proceedings (monitory and executory) based on the most recent decisions of courts as to which was the proper procedure, which decisions kept changing.

[29]     Article 83 of the Brazilian Code of Civil Procedure requires a plaintiff, Brazilian or foreign, who resides outside Brazil to provide "sufficient security to pay the costs and attorney's fees of the opposing party." No bond is required, however, where the lawsuit is based upon an "extrajudicial" and "executory" right. (*Id.*) Brazilian law considers certain kinds of debts as the functional equivalent of judgments that are extrajudicial – including, most notably, bonds or debentures. C.P.C. art. 784. In addition, "public deeds or other public documents executed by the debtor" are also considered to be extrajudicially enforceable instruments. Because Eletrobras' obligations under the Bearer Bonds fit into either or both of those categories, they are extrajudicial and exigible and **no bond should have been imposed by the court**.

[30]     According to Mr. de Siqueira, the PwC Report was provided to him by Mr. Paulo Salerno, on behalf of Mr. Gilles Azevedo, Chief of then-President Dilma's office in Brasilia, Brazil, and Mr. Christian Lemos, Chief of Dilma's office in Porto Alegre, Brazil, in the context of Mr. de

found that Eagle's claims under the Bearer Bonds were "possible" and instructed Eletrobras that – **considering the monetary value of Eagle's claim – it should disclose the Eagle Lawsuit in the notes to its financial statements and include the amount Eagle was seeking in Eletrobras' liabilities**.  PwC warned Eletrobras about the serious consequences of failing to disclose the Eagle Lawsuit in its financial statements.

99.    Meanwhile, on January 27, 2016, the <u>third</u> judge appointed to oversee the Eagle Lawsuit in as many years (Judge Anderson Santos da Silva) denied Eagle's motion for reconsideration of the order for it to submit a U.S. $250 million bond and dismissed the complaint without prejudice for Eagle's failure to post the bond. The Court also held that Eagle should have filed an ordinary procedure to have the Bearer Bonds recognized as enforceable, rather than a monitory proceeding.

100.    Eagle then filed a motion for reconsideration of the January 27, 2016 ruling, which a <u>fourth</u> judge (Luis Norton Baptista de Mattos) dismissed on April 14, 2016.  In between these decisions, a <u>fifth</u> judge, Bruno Otero Nery, issued various minor rulings.

101.    On April 11, 2016, Eagle sent a notification to Hogan Lovells, which was then assisting with the internal investigation of Eletrobras, alerting it to irregularities on Eletrobras' 2014 and 2015 Form F-20s – specifically, that there was no mention of the diversion of billions of dollars to Eletrobras' controlling shareholders, which was harming Eletrobras' creditors and minority shareholders. On June 20, 2016, Eagle sent a similar notification to KPMG, Eletrobras'

---

Siqueira's negotiations with Eletrobras about the Eagle Lawsuit and the Bearer Bonds. At that time, the Brazilian government purportedly wanted to make a deal with Eagle and AHG to pay 20% of the amounts due under the Bearer Bonds. According to Mr. de Siqueira, when it appeared to him that Messrs. Salerno, Christian, and Giles may have been attempting to solicit a bribe from him in exchange for the PwC Report, out of an abundance of caution, Mr. de Siqueira cancelled all of their meetings and forwarded the PwC Report to the SEC and to multiple PwC offices around the world.

independent auditor at that time.

102.    Eagle filed its appeal on June 6, 2016 with the Federal Court of Appeal of the 2nd Region requesting that the Court reinstate the October 11, 2013 ruling. This appeal is currently pending – more than three years after it was filed.

103.    The MPF Investigation was closed on August 30, 2017. The MPF found that, because the Bearer Bonds had purportedly prescribed, it did not need to investigate the alleged misappropriation of funds by Eletrobras, noting that Eletrobras could do as it wished with its resources.[31]

104.    On November 17, 2017, AAE met with a representative of the United Arabs Emirates embassy and Defendant Ferreira in Brazil to discuss Eletrobras' obligations under the Bearer Bonds and a possible resolution of Plaintiffs' claims. Two days later, on November 19, 2017, AAE and the embassy representative met with the Brazilian Minister of Mines and Energy for the same purpose. Following a press release issued by AAE discussing the meetings, Eletrobras publicly issued a "Market Announcement" on December 1, 2017, in which it disavowed its obligations under the Bearer Bonds.

105.    On September 18, 2018, in the AHG Lawsuit, the Court denied AHG's motion for reconsideration and upheld the dismissal of the action, finding that because the registrations were not "extrajudicial titles" executory process was not the appropriate procedure. AHG has filed an appeal of the Court's decision to the STJ, which is currently pending.  This appeal has been pending for more than a year.

---

[31]    For this conclusion, the MPF relied upon an STJ ruling from 2008 (Special Appeal No. 1.050.199), discussed in more detail below.  ***That case did __not__, however, hold that the Bearer Bonds are time-barred***.

IV.     **THE 2019 STJ DECISION**

106.    On June 12, 2019, in Special Appeal No. 79028989/PR, the STJ issued a summary

of a "consolidating decision" in which it resolved an important divergence among previous STJ

rulings with respect to the Compulsory Loan Program. The full decision was later officially

published on September 2, 2019 (previously defined as the "2019 STJ Decision").

107.    In the 2019 STJ Decision, the STJ held that, in accordance with Law No. 1,512/76,

**Eletrobras must pay interest of 6% per year until the date of actual payment (or conversion**

**into shares) of the Compulsory Loan Credits**.   The Court explicitly rejected Eletrobras' position

that interest would accrue only until June 30, 2005 (the date of the shareholders meeting when the

third conversion of Compulsory Loan Credits (formed between 1988 and 2004) was approved).

108.    Prior to this ruling, there were two earlier rulings by the STJ that conflicted with

one another. First, in the 2009 STJ Decision, the STJ held that 6% interest accrued on the

Compulsory Loan Credits until the date of actual payment (or conversion) of the Credits. *See supra*

¶ 72.  Then, in a 2011 ruling (Resp. No. 826,809/RS), the STJ shifted course, holding that the 6%

interest should be paid only until the date of the Eletrobras shareholders meeting that approved the

conversion of the Credits into shares, and that there could not be simultaneous accrual of interest

and SELIC.

109.    The 2019 STJ Decision re-establishes what had been decided in the 2009 STJ

Decision – *i.e.*, that for the portion of Compulsory Loan Credits not converted into shares, interest

should be charged at 6% plus the SELIC rate until the actual payment (or conversion) of the

Credits. As a result, under the 2019 STJ Decision, Eletrobras could potentially face billions of

dollars more in liability under the Compulsory Loan Credits. Indeed, Minister Herman Benjamin,

one of the judges on the 2019 STJ Decision panel, was reported as describing the decision as

"open[ing] a Pandora's box."

110.   As such, the 2019 STJ Decision clearly indicates a significant shift in STJ's position. What is more, because it is a "consolidating opinion" that resolves conflicting case law, it should have precedential effect. And, even if the 2019 STJ Decision did not specifically state that it was resolving conflicting case law, it indicates a significant shift in the STJ's position regarding when interest is due under the Compulsory Loan Obligations, and it is therefore highly likely that the STJ will apply this same position to other lawsuits involving this exact same issue, thereby increasing the amount owed by Eletrobras to creditors.

111.   Further, while the 2019 STJ Decision does not explicitly reference the Bearer Bonds, its reference to Law No. 1,512/76, which incorporates Law No. 4,156/62 (the law establishing the Compulsory Loan Program, under which the Bearer Bonds were issued), strongly suggests that the decision could apply to the Bearer Bonds as well.  *See supra* ¶ 107.

112.   Yet, inexplicably, as discussed below, in its public filings since the 2019 STJ Decision was released, Eletrobras has determined that it does not need to change the way it is accounting for its Compulsory Loan Obligations, despite the fact that this decision will result in potentially billions of dollars more in liability for Eletrobras under the Compulsory Loan Credits. Nor has Eletrobras changed its position regarding the validity and enforceability of the Bearer Bonds in light of the 2019 STJ Decision.

113.   What is more, in another desperate and unfounded attempt to avoid its Compulsory Loan Obligations, on September 9, 2019, Eletrobras filed a motion for reconsideration of the 2019 STJ Decision, making the same arguments that have already been rejected by the STJ. That motion is currently pending.

## V.   FALSE AND MISLEADING STATEMENTS AND/OR MATERIAL OMISSIONS REGARDING ELETROBRAS' COMPULSORY LOAN OBLIGATIONS

### A.   FALSE AND/OR MISLEADING STATEMENTS AND/OR MATERIAL OMISSIONS IN THE 2018 ANNUAL REPORT

114.    On April 30, 2019, Eletrobras filed with the SEC, on Form 20-F, its annual report for the full year 2018, which was signed by Defendants Ferreira and Presta (previously defined as the "2018 Annual Report"). In addition to signing the 2018 Annual Report, Defendants Ferreira and Presta also signed Sarbanes Oxley Certifications, in which they purported to certify and attest to the truth, accuracy, and completeness of the entire 2018 Annual Report. *See infra* ¶ 213.

115.    Despite these representations, as outlined below, certain statements contained in Eletrobras' 2018 Annual Report were materially false and/or misleading when made and/or omitted material facts necessary to make such statements true, accurate, and reliable, in light of circumstances that existed at that time, and were known by Defendants to be false at that time, or were recklessly disregarded as such.

### 1.    False and/or Misleading Statements and/or Material Omissions Regarding Eletrobras' Liability Under the Bearer Bonds

116.    As discussed below, in the 2018 Annual Report, in connection with the Bearer Bonds specifically, Defendants **affirmatively represent that Eletrobras has no liability whatsoever under the Bearer Bonds**. In so doing, Defendants make a number of false and/or misleading statements and/or omit a number of material facts regarding the Bearer Bonds, which Defendants knew or recklessly disregarded were materially false and/or misleading when published.

117.    Specifically, on page 24 of the 2018 Annual Report, Defendants represent that:

*We may incur losses in legal proceedings in respect of compulsory loans made from 1962 through to 1993.*

The Compulsory Loan on electricity consumption, instituted by Law No. 4,156/62

with the purpose of generating funds for the expansion of the Brazilian electricity sector, was abolished by Law No. 7,181/83, which fixed the date of December 31, 1983 as the final collection deadline.

In the first phase of this Compulsory Loan, closed with the enactment of Decree-Law No. 1,512/76, the collection of the tax reached several classes of energy consumers, and taxpayers' credits were represented by bonds issued by the Company. Although we believe that we have no further liability to these bonds because they are expired, any legal interpretation that the bonds have not expired could adversely affect our financial condition and the results of our operations.

118.   On page 133 of the 2018 Annual Report, under "Item 8. Financial Information," in a section discussing the litigation pending against the Company, Defendants represent that:

**Compulsory Loans**

The Compulsory Loans on electricity consumption, instituted by Law No. 4,156/1962 with the purpose of generating funds for the expansion of the Brazilian electricity sector, was abolished by Law No. 7,181, dated December 20, 1983, which fixed the date of December 31, 1983 as the final collection deadline.

In the first phase, which ended with the enactment of Decree-Law No. 1,512/1976, the collection of the tax with respect to Compulsory Loans reached several classes of energy consumers, and taxpayers' credits were replaced by bonds issued by the Company. Although we believe that we have no further liability to these bonds because they have matured, any legal interpretation that the bonds have not matured could adversely affect our financial condition and the results of our operations.

We believe that the Bearer Bonds, issued as a result of the Compulsory Loans, do not constitute securities, are not tradable on any stock exchange, are not priced and are non-enforceable. Accordingly, our management clarifies that we do not have outstanding debentures relating to the Compulsory Loans.

The Superior Court of Justice has corroborated our understanding that these bonds are proscribed and not enforceable.

119.   On pages F-127-128 of the 2018 Annual Report, under "Item 18. Financial Statements, Note 23 – Compulsory Loan," Defendants represent that:

**NOTE 23 — COMPULSORY LOAN**

The Compulsory Loan on electric energy consumption, instituted by Law No. 4,156/1962 with the purpose of generating funds for the expansion of the Brazilian electricity sector, was abolished by Law No. 7,181, dated December 20, 1983,

which fixed the date of December 31, 1993 as the final collection deadline.

In the first phase of this Compulsory Loan, closed with the advent of Decree-Law No. 1,512/1976, the collection of the tax reached several classes of energy consumers, and taxpayers' credits were represented by Bearer Bonds issued by the Company.

The Bearer Bonds, issued as a result of the Compulsory Loan, do not constitute securities, are not tradable on the stock exchange, are not priced and are unenforceable. Therefore, the Company's Management clarifies that the Company has no outstanding debentures.

The issuance of these securities resulted from a legal imposition and not from a corporate decision of the Company. Likewise, its takeover by the bondholders did not emanate from an act of will, but from a legal duty, by virtue of Law No. 4,156/1962.

The CVM, in a decision of its Board of Directors rendered in administrative proceeding CVM RJ 2005/7230, filed by said bondholders, states that "the bonds issued by the Company as a result of Law No. 4,156/1962 cannot be considered as securities."

The CVM also understood that there is no irregularity in the procedures adopted by the Company in its financial statements, regarding the aforementioned obligations, nor in the disclosure regarding the existence of legal proceedings.

The non-enforceability of these Bearer Bonds was reinforced by decisions of the Superior Court of Justice, which corroborate the understanding that these securities are expired and cannot guarantee tax foreclosures.

Therefore, the Bearer Obligations issued in the first phase of this compulsory loan, as decided by the CVM, are not to be confused with debentures. In addition, pursuant to article 4, paragraph 11 of Law No. 4,156/1962 and article 1 of Decree No. 20,910/1932, they are unenforceable, a condition confirmed in Information 344 of the Superior Court of Justice - STJ, which states that these Bonds cannot be used as guarantee for tax foreclosures, because they have no liquidity and are not debentures. For this reason, they are not provisioned.

120.    Notably, unlike in connection with the Compulsory Loan Credits, for which the Company makes specific litigation provisions for probable and possible losses (*see infra* ¶¶ 141-142, 157-158), Defendants affirmatively disclaim any liability whatsoever under the Bearer Bonds and specifically note that they have provisioned absolutely no contingencies for any such liability.

In order to arrive at this conclusion, as outlined below, Defendants make a number of false and/or misleading statements and/or omit material facts necessary to make such statements true and accurate with respect to the Bearer Bonds and their obligations thereunder.

> **a.      Statements Regarding Liability and Past Judicial Decisions**

121.    As outlined above, in the 2018 Annual Report, Defendants represent that they have no liability under the Bearer Bonds, in part as a result of certain unidentified judicial decisions:

> Although <u>we believe that we have no further liability to these bonds</u> because they are expired, any legal interpretation that the bonds have not expired could adversely affect our financial condition and the results of our operations.
>
> \* \* \*
>
> Although <u>we believe that we have no further liability to these bonds</u> because they have matured, any legal interpretation that the bonds have not matured could adversely affect our financial condition and the results of our operations.
>
> \* \* \*
>
> <u>The Superior Court of Justice has corroborated our understanding that these bonds are proscribed and not enforceable.</u>
>
> \* \* \*
>
> <u>The non-enforceability of these Bearer Bonds was reinforced by decisions of the Superior Court of Justice, which corroborate the understanding that these securities are expired and cannot guarantee tax foreclosures.</u>

(2018 Annual Report, pp. 24, 133, F-128.)

122.    Although not cited to by Defendants, it appears that they are referring to STJ Special Appeal No. 1.050.199 (2008) (the "2008 STJ Decision"). These statements, and the reference upon which they are based, are false and/or misleading and/or omit material facts.

123.    Specifically, in the 2008 STJ Decision, the STJ did not – as Defendants imply – declare that the Bearer Bonds are time-barred. Nor did the STJ rule on the enforceability of the Bearer Bonds. Rather, all the STJ did was establish the applicable statute of limitations period(s).

The Court ruled that Eletrobras' obligations were governed by the five-year tax statute of limitations (as opposed to the twenty-year limitations period for commercial obligations). However, Eletrobras, which is not the government, but a corporation whose shares are publicly traded, cannot create any taxes. Further, Brazilian law is clear as to what a bearer security is, and that category includes debentures.[32]

124.    Second, even assuming *arguendo* that the 2008 STJ Decision held as Eletrobras states that it did, this decision does not have binding effect. This is because, as noted above, *stare decisis* does not generally apply in Brazil.  *Supra* ¶ 88. Indeed, in order for a court decision to be binding on all future cases, generally at least ten (or all fifteen, depending on the type of decision) of the ministers of the STJ must agree on the ruling, which is often titled a "Súmula Vinculante" ("Binding Precedent"). That is not the case with respect to the 2008 STJ Decision. Thus, Eletrobras' implication that the 2008 STJ Decision governs all the Bearer Bonds is materially false and/or misleading and was known by Defendants to be false and/or misleading at that time, or was reckless disregarded as such.

125.    Third, the issuance of the contrary 2019 STJ Decision (as well as the 2009 STJ Decision) discussed above demonstrates that other contradictory rulings on this issue exist. Indeed, while the 2019 STJ Decision does not explicitly reference the Bearer Bonds, its reference to Law No. 1,512/76, which incorporates Law No. 4,156/62 (the law establishing the Compulsory Loan Program, under which the Bearer Bonds were issued) strongly suggests that the decision could apply to the Bearer Bonds as well. *Supra* ¶ 111.

126.    Eletrobras' statements are further belied by the Court's decision in the Eagle Lawsuit, in which (as outlined above, *supra* ¶ 93) the Court found that there was "probable

---

[32]    *See* Law No. 6,385/76; Law No. 4,278/65.

existence" of the debt under the Bearer Bonds and ordered Eletrobras to pay the amount sought in the complaint within fifteen days of the order.

127.    Finally, these statements are belied by the express recognition of the Compulsory Loan Obligations by the Brazilian government. More specifically, on May 14, 2018, a draft law was presented to the Brazilian National Congress (Bill of Law No. 10.029/18), which provided for the redemption and securitization of debentures and bonds issued by Eletrobras under the Compulsory Loan Program. This presentation explicitly acknowledged Eletrobras' liabilities for its Compulsory Loan Obligations as recently as mid-2018.

128.    And, while this bill was later withdrawn on January 31, 2019, in April 2019, the Brazilian government again filed a draft bill (No. 2502/19) in the National Congress providing for the securitization of Eletrobras' Compulsory Loan Obligations, in an effort to resolve the thousands of lawsuits pending against Eletrobras for collection of the Compulsory Loan Obligations.[33] These draft bills are factual evidence that the government of Brazil is aware of Eletrobras' liability under the Bearer Bonds and Compulsory Loan Credits.

129.    Nevertheless, Eletrobras continues to mislead investors regarding it liabilities in connection with them. Through these false and/or misleading statements, Defendants are knowingly and/or recklessly misstating and underreporting Eletrobras' liabilities in connection with the Bearer Bonds, thereby falsely reducing the value of the Bearer Bonds and correspondingly falsely inflating the value of Eletrobras' common and preferred stock and ADRs, making it impossible for all of Eletrobras' securities holders to accurately value their securities, and harming all of Eletrobras' security holders. Indeed, in light of the fact that *Eletrobras' liabilities under the*

---

[33]    This bill is currently pending before the House of Representatives.

***Bearer Bonds are more than one-third of Eletrobras' U.S. $12 billion market cap***, Defendants'
affirmative denial of Eletrobras' liability under the Bearer Bonds in the face of authority to the
contrary and their refusal to provision for them as either probable or even possible liabilities is
particularly material.

### b.    Statements Regarding Liability and "Information 344"

130.    As outlined above, in the 2018 Annual Report, Defendants also represent that they
have no liability under the Bearer Bonds in part as a result of "Information 344":

> Although <u>we believe that we have no further liability to these bonds</u> because they
> are expired, any legal interpretation that the bonds have not expired could adversely
> affect our financial condition and the results of our operations.
>
> * * *
>
> Although <u>we believe that we have no further liability to these bonds</u> because they
> have matured, any legal interpretation that the bonds have not matured could
> adversely affect our financial condition and the results of our operations.
>
> * * *
>
> <u>The Superior Court of Justice has corroborated our understanding that these bonds
> are proscribed and not enforceable.</u>
>
> * * *
>
> In addition, pursuant to article 4, paragraph 11 of Law No. 4,156/1962 and article
> 1 of Decree No. 20,910/1932, they are unenforceable, a condition confirmed in
> Information 344 of the Superior Court of Justice - STJ, which states that these
> Bonds cannot be used as guarantee for tax foreclosures, because they have no
> liquidity and are not debentures. <u>For this reason, they are not provisioned.</u>

(2018 Annual Report, pp. 24-25, 133, F-127-28.)

131.    Again, however, contrary to Eletrobras' characterization, ***Information 344 does not
address whether the Bearer Bonds are enforceable, much less "confirm" that the Bearer Bonds
are "unenforceable."*** Rather, Information 344 merely summarizes another non-binding STJ
decision (Special Appeal No. 824903 (2008)), which held that the government was not legally

required to accept the Bearer Bonds as a guarantee for tax foreclosures because the plaintiff in that specific lawsuit had more liquid assets that could be used in lieu of the Bearer Bonds.

132.     Further, as Defendants are well aware, but failed to disclose and/or recklessly disregarded, an "Information" is not a legal opinion. Rather, it is akin to a law review article, authored by a clerk of the court, summarizing recent court decisions. It has <u>absolutely no precedential value</u> and certainly should not form the basis for a legal conclusion in an SEC filing affecting billions of dollars in liabilities. As further evidence of Defendants' purposeful deception, rather than cite to the actual STJ opinion itself, Defendants instead cited to a summary of the opinion, which omits relevant details, thereby mischaracterizing the opinion in support of Defendants' erroneous legal conclusion that the Bearer Bonds are not valid or enforceable.

133.     Through these false and/or misleading statements, Defendants are knowingly and/or recklessly misstating and underreporting Eletrobras' liabilities in connection with the Bearer Bonds, thereby falsely reducing the value of the Bearer Bonds and correspondingly falsely inflating the value of Eletrobras' common and preferred stock and ADRs, making it impossible for all of Eletrobras' securities holders to accurately value their securities, and harming all of Eletrobras' security holders. Indeed, in light of the fact that Eletrobras' liabilities under the Bearer Bonds are more than one-third of Eletrobras' U.S. $12 billion market cap, Eletrobras' affirmative denial of its liability under the bonds in the face of authority to the contrary and its refusal to provision for them as either probable or even possible liabilities is particularly material.

c.     **Statements Regarding Debentures and the CVM Decision**

134.     In the 2018 Annual Report, Defendants also purport to draw a distinction between the Bearer Bonds and "debentures," relying on this misleading distinction to support their false conclusion that the Bearer Bonds "are unenforceable." To support this argument, they singularly

rely on a 2005 decision by the CVM (CVM RJ 2005/7230) (the "CVM Decision"):

> We believe that the Bearer Bonds, issued as a result of the Compulsory Loans, do not constitute securities, are not tradable on any stock exchange, are not priced and are non-enforceable. Accordingly, <u>our management clarifies that we do not have outstanding debentures relating to the Compulsory Loans</u>.

> \* \* \*

> The Bearer Bonds, issued as a result of the Compulsory Loan, do not constitute securities, are not tradable on the stock exchange, are not priced and are unenforceable. Therefore, the Company's Management clarifies that the Company has no outstanding debentures.

> The CVM, in a decision of its Board of Directors rendered in administrative proceeding CVM RJ 2005/7230, filed by said bondholders, states that "the bonds issued by the Company as a result of Law No. 4,156/1962 cannot be considered as securities."

> The issuance of these securities resulted from a legal imposition and not from a corporate decision of the Company. Likewise, its takeover by the bondholders did not emanate from an act of will, but from a legal duty, by virtue of Law No. 4,156/1962.

> The CVM also understood that there is no irregularity in the procedures adopted by the Company in its financial statements, regarding the aforementioned obligations, nor in the disclosure regarding the existence of legal proceedings.

> \* \* \*

> Therefore, the Bearer Obligations issued in the first phase of this compulsory loan, as decided by the CVM, are not to be confused with debentures. In addition, pursuant to article 4, paragraph 11 of Law No. 4,156/1962 and article 1 of Decree No. 20,910/1932, they are unenforceable, a condition confirmed in Information 344 of the Superior Court of Justice - STJ, which states that these Bonds cannot be used as guarantee for tax foreclosures, because they have no liquidity and are not debentures. <u>For this reason, they are not provisioned.</u>

(2018 Annual Report, pp.133, F-127-28.)

135.    As an initial matter, Defendants' position is unsupported by other sections of the

2018 Annual Report itself. For example, in the very same 2018 Annual Report – indeed, in the

very next paragraph – Eletrobras refers to the Bearer Bonds as "securities":

> The Bearer Bonds, issued as a result of the Compulsory Loan, do not constitute securities, are not tradable on the stock exchange, are not priced and are unenforceable. Therefore, the Company's Management clarifies that the Company has no outstanding debentures.
>
> The issuance of these **_securities_** resulted from a legal imposition and not from a corporate decision of the Company. Likewise, its takeover by the bondholders did not emanate from an act of will, but from a legal duty, by virtue of Law No. 4,156/1962.

(2018 Annual Report, p. F-127.)   Eletrobras also refers to the Bearer Bonds as "Bearer Obligations" (*id.* at F-128), creating further confusion for investors.

136.   More importantly, Eletrobras fails to disclose to shareholders that the CVM Decision addressed the appropriate forum for the dispute – not whether the Bearer Bonds were enforceable. The CVM held that the issue of whether the Bearer Bonds were enforceable was something for the judiciary to decide, not the CVM.  Contrary to Defendants' materially false and/or misleading statements, which they knew, or recklessly disregarded, were false and/or misleading, the CVM Decision **did not address the validity or enforceability of the Bearer Bonds.**

137.   What is more, Defendants do not explain how the question of whether the Bearer Bonds are "securities" is relevant to the validity or enforceability of these obligations. This is because there is none. **Whether or not the Bearer Bonds are "securities" does not affect whether they are valid and enforceable commercial obligations**.

138.   Through these false and/or misleading statements, Defendants are knowingly and/or recklessly misstating and underreporting Eletrobras' liabilities in connection with the Bearer Bonds, thereby falsely reducing the value of the Bearer Bonds and correspondingly falsely inflating the value of Eletrobras' common and preferred stock and ADRs, making it impossible for all of Eletrobras' securities holders to accurately value their securities, and harming all of

Eletrobras' security holders. Indeed, in light of the fact that Eletrobras' liabilities under the Bearer Bonds are more than one-third of Eletrobras' U.S. $12 billion market cap, Defendants' affirmative denial of Eletrobras' liability under the Bonds in the face of authority to the contrary and their refusal to provision for them as either probable or even possible liabilities is particularly material.

### d.    Financial Statements Regarding Liabilities

139.    Finally, as a result of the false and/or misleading statements outlined above, Eletrobras' Financial Statements, which are attached as Item 18 to the 2018 Annual Report, are likewise false and/or misleading and/or omit material facts, in that they <u>completely omit billions of dollars owed under the Bearer Bonds</u>.

140.    Specifically, as outlined above (*supra* ¶¶ 116-119), in the 2018 Annual Report, Defendants represent that the Bearer Bonds are unenforceable. Indeed, and unlike in connection with the Compulsory Loan Credits, for which the Company makes specific litigation provisions for probable and possible losses (*see infra* ¶¶ 142, 157-158), Defendants affirmatively disclaim any liability whatsoever under the Bearer Bonds and specifically note that they have provisioned no contingencies of any kind for any such liability whether it be probable or even possible:

> Although <u>we believe that we have no further liability to these bonds</u> because they are expired, any legal interpretation that the bonds have not expired could adversely affect our financial condition and the results of our operations.
>
> * * *
>
> Although <u>we believe that we have no further liability to these bonds</u> because they have matured, any legal interpretation that the bonds have not matured could adversely affect our financial condition and the results of our operations.
>
> * * *
>
> <u>The Superior Court of Justice has corroborated our understanding that these bonds are proscribed and not enforceable.</u>
>
> * * *

> In addition, pursuant to article 4, paragraph 11 of Law No. 4,156/1962 and article 1 of Decree No. 20,910/1932, they are unenforceable, a condition confirmed in Information 344 of the Superior Court of Justice - STJ, which states that these Bonds cannot be used as guarantee for tax foreclosures, because they have no liquidity and are not debentures. <u>For this reason, they are not provisioned.</u>

(2018 Annual Report, pp. 24, 133, F-128.)

141.   As a result, in Eletrobras' Financial Statements, which are attached as Item 18 to the 2018 Annual Report, **billions of dollars in liabilities owed under the Bearer Bonds are entirely omitted:**

**CENTRAIS ELÉTRICAS BRASILEIRAS S.A - ELETROBRAS AND SUBSIDIARIES**
**BALANCE SHEET FOR THE PERIODS ENDED DECEMBER 31, 2018 AND 2017**
(In thousands of reais)

| LIABILITIES AND EQUITY | NOTE | 12/31/2018 | 12/31/2017 |
|---|---|---|---|
| **CURRENT** | | | |
| Financing and loans | 21 | 12,066,912 | 5,886,141 |
| Debentures | 22 | 36,073 | 183,432 |
| Compulsory loan | 23 | 15,659 | 42,260 |
| Suppliers | 19 | 3,360,550 | 10,443,752 |
| Advances from clients | 20 | 421,002 | 654,853 |
| Taxes payable | 24 | 1,277,051 | 1,173,319 |
| Current income and social contribution taxes | 24 | 2,953,072 | 1,498,218 |
| Provisions for Onerous contracts | 31 | 9,436 | 12,048 |
| Shareholders' Compensation | 26 | 1,305,633 | 18,339 |
| Payroll | | 1,366,376 | 1,204,222 |
| Reimbursement obligations | 11 | 1,250,619 | 1,392,542 |
| Post-employment benefits | 27 | 164,160 | 193,847 |
| Provisions for litigation | 28 | 931,364 | 1,518,387 |
| Regulatory fees | 25 | 653,017 | 728,180 |
| Leasing | 21 | 152,122 | 145,324 |
| Derivative financial instruments | 40 | 962 | 2,466 |
| Liabilities associated to assets held for sale | 44 | 10,294,967 | 7,630,670 |
| Others | | 264,996 | 1,458,952 |
| **TOTAL CURRENT LIABILITIES** | | **36,523,971** | **34,186,952** |
| | | | |
| **NON-CURRENT** | | | |
| Financing and loans | 21 | 42,305,886 | 39,235,650 |
| Suppliers | 19 | 16,555 | 7,795,345 |
| Debentures | 22 | 432,155 | 287,347 |
| Advances from clients | 20 | 448,881 | 519,391 |
| Compulsory loan | 23 | 477,459 | 458,874 |
| Asset decomission obligation | 29 | 2,620,128 | 2,470,400 |
| Provisions for litigation | 28 | 23,196,295 | 23,033,963 |
| Post-employment benefits | 27 | 2,894,949 | 2,001,715 |
| Provisions for Onerous contracts | 31 | 715,942 | 2,067,179 |
| Reimbursement obligations | 11 | — | 1,062,634 |
| Leasing | 21 | 823,993 | 932,496 |
| Concessions payable - use of public property | | 64,144 | 63,082 |
| Advances for future capital increase | 30 | 3,873,412 | 3,639,441 |
| Derivative financial instruments | 40 | 25,459 | 39,594 |
| Regulatory fees | 25 | 721,536 | 698,423 |
| Taxes payable | 24 | 248,582 | 326,527 |
| Deferred income tax and social contributions | 10 | 8,315,386 | 8,901,931 |
| Others | | 1,496,527 | 2,501,883 |
| **TOTAL NON-CURRENT LIABILITIES** | | **88,677,289** | **96,035,875** |
| | | | |
| **EQUITY** | | | |
| Capital stock | 33 | 31,305,331 | 31,305,331 |
| Capital reserves | 33 | 13,867,170 | 13,867,170 |
| Profit reserves | 33 | 15,887,829 | 1,321,854 |
| Adjustments to equity | | — | 22,434 |
| Accumulated other comprehensive loss | | (5,517,424) | (4,177,412) |
| Non-controlling interests | | 466,042 | 413,155 |
| **TOTAL EQUITY** | | **56,008,948** | **42,752,532** |
| | | | |
| **TOTAL LIABILITIES AND EQUITY** | | **181,210,208** | **172,975,359** |

F-9

2018 Annual Report, p. F-9.

142.    As Notes 23 and 28 to the Financial Statements make clear (*infra* ¶¶ 157-158), the provisioned amounts highlighted above are related only to the Compulsory Loan Credits (from Phase Two) – consisting of R $15,659,000 (U.S. $4.034 million) for current liabilities and R $477,459,000 (U.S. $123.027 million) for non-current liabilities – and the Monetary Correction

Claims concerning the Compulsory Loan Credits – consisting of R $931,364,000 (U.S. $ 239,984,934) for current liabilities and R $17,941,912 (U.S. $ 4,623,099) for non-current liabilities. Accordingly, the Bearer Bonds are not listed as liabilities of Eletrobras, nor are they listed as probable or even possible liabilities in Eletrobras' Financial Statements.

143.    Thus, for the same reasons outlined above, *supra* ¶¶ 116-138, Eletrobras' Financial Statements are thus materially false and/or misleading.

144.    Eletrobras' Financial Statements are also not maintained in accordance with the relevant accounting standards. In the 2018 Annual Report, Defendants represent that they have "prepared our consolidated annual financial statements as of and for the years ended December 31, 2018, 2017 and 2016 . . . in compliance with International Financial Reporting Standards ('IFRS') as issued by the International Accounting Standards Board ('IASB')." (2018 Annual Report, p. 1.)

145.    Pursuant to International Accounting Standard ("IAS") 1, financial statements must "present fairly" the financial position, financial performance, and cash flows of an entity. Fair presentation requires the faithful representation of the effects of transactions, other events, and conditions in accordance with the definitions and recognition criteria for assets, **liabilities**, income, and expenses set out in the [IAS] Framework. IAS 1 further requires an entity whose financial statements comply with IFRSs to make an explicit and unreserved statement of such compliance in the notes. Financial statements cannot be described as complying with IFRSs unless they comply with all the requirements of IFRSs (which includes IFRSs, International Accounting Standards, International Financial Reporting Interpretations Committee interpretations, and Standard Interpretations Committee interpretations). Inappropriate accounting policies are not rectified either by disclosure of the accounting policies used or by notes or explanatory material.

Information is material if omitting, misstating, or obscuring it could reasonably be expected to influence decisions that the primary users of general purpose financial statements make on the basis of those financial statements, which provide financial information about a specific reporting entity.

146.    Pursuant to IAS 37, a "liability" is defined as a "present obligation as a result of past events" where "settlement is expected to result in an outflow of resources (payment)," and an entity **must** recognize a provisions if "a present obligation (legal or constructive) has arisen as a result of a past event (the obligating event), payment is probable ('more likely than not'), and the amount can be estimated reliably." Here, pursuant to their plain terms, the Bearer Bonds are a "present obligation" due upon presentment; as outlined above (*supra* ¶¶ 75-78, 93, 98, 121-125), there is no binding authority that negates their validity, they remain validly registered, the PwC Report found that Eagle's claims under the Bearer Bonds were "possible" and that the amount Eagle was seeking under the Bearer Bonds needed to be included in Eletrobras' liabilities, and the first judge in the Eagle Lawsuit found that there was "probable existence" of the debt under the Bearer Bonds and ordered Eletrobras to pay the amount sought, such that payment is probable; and the amount can be estimated reliably through basic calculation of accrued interest. Accordingly, Eletrobras must provision for these obligations, and Defendants' failure to do so renders Eletrobras' Financial Statements materially false and/or misleading.

147.    As outlined above (and further below, Eletrobras' financial statements do not "present fairly" its financial position because its liabilities in connection with its Compulsory Loan Obligations are materially understated, thereby rendering both its Financial Statements themselves, also Defendants' representation that those Financial Statements comply with applicable accounting standards, false and/or misleading.

148.   Eletrobras' Financial Statements are likewise not even maintained in accordance with its own disclosed "standards." Specifically, in the 2018 Annual Report, Defendants represent that:

> NOTE 28 - PROVISION FOR LITIGATION
>
> The Company and its subsidiaries are parties to a number of ongoing legal proceedings, particularly in labor and civil matters, which are in various stages of judgment.
>
> The Company's Management adopts the procedure to classify the legal proceedings filed against the Company based on the risk of loss and the occurrence of a present obligation related to a past event, based on the opinion of its legal advisors, as follows:
>
> · For cases whose negative outcome for the Company is considered probable, in addition to meeting the present obligation condition linked to past event, provisions are recorded and their related information is disclosed in notes, where relevant;
>
> · For cases whose negative outcome for the Company is considered as possible, no provision is made and its corresponding information is disclosed in notes, when relevant; and
>
> · For cases whose negative outcome for the Company is considered remote, no provision is made and only the relevant information, which, at the discretion of the management, is deemed relevant for the full understanding of the financial statements, is disclosed in notes.
>
> Therefore, in order to cover for probable losses, provisions for contingencies are constituted, according to a judgment made by the management of the Company and its subsidiaries, supported by its legal advisors, sufficient to cover possible losses in legal proceedings.

149.   Again, in light of the fact that the Bearer Bonds are due upon presentment; as outlined above (*supra* ¶¶ 75-78, 93, 98, 121-125), there is no binding authority that negates their validity, they remain validly registered, the PwC Report found that Eagle's claims under the Bearer Bonds were "possible" and that the amount Eagle was seeking under the Bearer Bonds needed to be included in Eletrobras' liabilities, and the first judge in the Eagle Lawsuit found that there was

"probable existence" of the debt under the Bearer Bonds and ordered Eletrobras to pay the amount sought, such that payment is probable; and the amount can be estimated reliably through basic calculation of accrued interest, Eletrobras must provision for them as probable liabilities, and its failure to do so renders its Financial Statements materially false and/or misleading.

150.    Finally, even if the Bearer Bonds were considered merely "possible" liabilities, Eletrobras would still be required to disclose fully all relevant information regarding them. For example, pursuant to IAS 37, a "contingent liability" is defined as "a possible obligation depending on whether some uncertain future event occurs, or a present obligation but payment is not probable or the amount cannot be measured reliably," and such a "possible obligation (a contingent liability) [must be] disclosed." These disclosures should include the nature, timing, uncertainties, assumptions, and reimbursement, if any. Similarly, pursuant to Eletrobras' own disclosed "standards," "for cases whose negative outcome for the Company is considered as possible," "corresponding information [must be] disclosed in notes."

151.    However, as outlined above (*supra* ¶¶ 141-142), Eletrobras does not identify the number of Bearer Bonds still circulating, their outstanding amount, the authorities on which it relies in coming to its conclusion that they are unenforceable, or an estimate of their value should they be deemed enforceable. For these reasons, again, its Financial Statements are materially false and/or misleading and/or omit material information.

152.    Through these false and/or misleading statements, Defendants are knowingly and/or recklessly misstating and underreporting Eletrobras' liabilities in connection with the Bearer Bonds, thereby falsely reducing the value of the Bearer Bonds and correspondingly falsely inflating the value of Eletrobras' common and preferred stock and ADRs, making it impossible for all of Eletrobras' securities holders to accurately value their securities, and harming all of

Eletrobras' security holders. In light of the fact that Eletrobras' liabilities under the Bearer Bonds are more than one-third of Eletrobras' U.S. $12.1 billion market cap, Defendants' affirmative denial of Eletrobras' liability under the Bonds in the face of authority to the contrary and their refusal to provision for them as either probable or even possible liabilities is particularly material.

153.    What is more, by failing to adhere to the applicable accounting standards outlined above (*supra* ¶¶ 144-146, 150), Defendants' representation that Eletrobras' Financial Statements are "prepared . . . in compliance with International Financial Reporting Standards ('IFRS') as issued by the International Accounting Standards Board ('IASB')" is further false and/or misleading.

## 2.    False and/or Misleading Statements and/or Material Omissions Regarding Eletrobras' Liability Under the Compulsory Loan Credits

154.    As discussed below, in the 2018 Annual Report, Defendants also make a number of false and/or misleading statements and omit a number of material facts regarding the Compulsory Loan Credits and the full extent of Eletrobras' liability thereunder, which Defendants again knew to be materially false and/or misleading or recklessly disregarded were materially false and/or misleading when published.

155.    Specifically, on pages 24-25 of the 2018 Annual Report, Defendants represent that:

*We may incur losses in legal proceedings in respect of compulsory loans made from 1962 through to 1993.*

* * *

In the second phase, under the provisions of the Decree-Law, the Compulsory Loan was charged only to industries with monthly energy consumption of more than 2,000 kwh, and taxpayers' credits were no longer represented by bonds held by the company. Most of these compulsory loan taxpayers' claims have been converted into preferred shares, as authorized by law, at four general shareholders' meetings, held in 1988, 1990, 2005 and 2008.

However, there is a remaining balance of compulsory loans not yet converted into

preferred shares. The balance of the remaining Compulsory Loans, after the fourth conversion into shares, relates to credits from 1988 to 1994, is recorded in current and noncurrent liabilities, payable from 2008 at the rate of 6% per year to the date of their conversion into shares, plus monetary adjustment based on the variation of the IPCA-E - Special Extended Consumer Price Index, corresponding, on December 31, 2018, to R$493.1 million (R$501.1 million on December 31, 2017), of which R$477.5 million are noncurrent assets (R$458.9 million on December 31, 2017).

In addition, there is litigation related to the Compulsory Loans challenging the criteria for monetary adjustment of the book-entry credits on electricity consumption, which were determined by the legislation and applied by us, as well as the application of inflationary adjustments arising from the economic plans implemented in Brazil.

The matter was decided by the STJ, but is currently subject to appeal to the Federal Supreme Court (STF). While this appeal is pending, we and the claimants have agreed on the method to calculate the amounts owed.

The most relevant issue concerns the time gap of the application of interest rates of 6% per year. Based on the current STJ precedent, the SELIC rate applied to the difference of monetary restatement (if any), as there are charges for judicial debts (monetary restatement is applied from the date of maturity and default interest is applied from the date of determination). In addition, we believe that consideration must be given to the five-year time limit for payment of compensation interest, as of the date of the lawsuit filing. We make provisions for these claims in accordance with this understanding, substantiated in Special Appeal 1003955/RS.

Despite our understanding, on February 27, 2019, the STJ re-opened a judgment of the Embargo de Divergência em Agravo in Special Appeal No. 790288/PR to reconsider the applicable period for remunerative interest. The claimant argues that the credits arising from the judicial decisions from differences in inflationary adjustments should apply continuously at 6% per year from the 143rd Extraordinary General Meeting on June 30, 2005.

Of the ten judges, four have voted against our position, two in favor, and four have yet to deliver their decisions. If the claimants prevail in this judgment, we believe it is fact specific and may not be applicable to other Compulsory Loan litigation. Therefore, we have not changed our provision relating to Compulsory Loan litigation. In addition, any outcome of the current reconsideration by the STJ may be subject to appeal.

However, if there is a change in the ruling of the STJ against us, specifically referring to the application of remunerative interest after the conversion meeting, the estimate of the provision, now recognized by Management, may change.

As of December 31, 2018, we had provisioned R$17.9 billion to cover losses arising from unfavorable decisions relating to these lawsuits. Despite our efforts to reduce losses related to these lawsuits, we cannot ensure that we will succeed, and if we are not successful, it could adversely affect our financial condition and our results of operations.

156.    On pages 133-134 of the 2018 Annual Report, under "Item 8. Financial Information," in a section discussing the litigation pending against the Company, Defendants represent that:

**Compulsory Loans**

* * *

In the second phase, under the provisions of the Decree-Law, the Compulsory Loans was charged only to industries with monthly energy consumption of more than 2,000 kwh, and taxpayers' credits were no longer represented by bonds held by the company. Most of these compulsory loan taxpayers' claims have been converted into preferred shares, as authorized by law, at four general shareholders' meetings, held in 1988, 1990, 2005 and 2008.

Lawsuits relating to Compulsory Loans challenge the criteria for monetary adjustment of the book-entry credits on electricity consumption, which were determined by the legislation and applied by us, as well as the application of inflationary adjustments arising from the economic plans implemented in Brazil.

The matter was decided by the STJ, but is currently subject to appeal to the Federal Supreme Court (STF). While this appeal is pending, we and the claimants have agreed on the method to calculate the amounts owed.

We maintain a provision for these civil contingencies of R$17,942 million as of December 31, 2018, of which: (i) R$6,373 million refers to the difference in principal arising from the monetary restatement, R$1,741 million of reflected compensatory interest, and, (iii) R$9,828 million of default interest, primarily the adjustment in accordance with the SELIC rate.

157.    On pages F-127-128 of the 2018 Annual Report, under "Item 18. Financial Statements, Note 23 – Compulsory Loan," Defendants represent that:

## NOTE 23 — COMPULSORY LOAN

* * *

In the second moment, started with the provisions contained in the aforementioned Decree-Law, the Compulsory Loan in question started to be charged only from industries with monthly energy consumption of more than 2,000 kwh*, and taxpayers' credits ceased to be represented by securities, to be simply held by the Company.

Most of these compulsory loan taxpayers' credits have already been converted into preferred shares, as authorized by law, through four general shareholders' meetings of Eletrobras, held on April 20, 1988, April 26, 1990, April 28, 2005 and April 30, 2008. However, there is a remaining balance of compulsory loan not yet converted.

The balance of the remaining Compulsory Loan, after the 4th conversion into shares, relating to credits constituted from 1988 to 1994, is recorded in current and non-current liabilities, payable as from 2008, and remunerated at the rate of 6% per annum until the date of its conversion into shares, plus monetary restatement based on the variation of the Special Consumer Price Index (IPCA-E), and corresponds to R$ 493,118 at December 31, 2018 (R$ 501,134 on December 31, 2017), of which R$ 477,459 in non-current assets (R$ 458,874 on December 31, 2017).

Thus, the liability for the Compulsory Loan refers to residual credits from 1988 to 1994 of industrial consumers consuming more than 2,000 kW/h*, related to the second phase of this Compulsory Loan, as well as unpaid annual interest on to these credits, as shown:

|  | 12/31/2018 | 12/31/2017 |
|---|---|---|
| CURRENT | | |
| Interest payable | 15,659 | 42,260 |
| NON-CURRENT | | |
| Credits raised | 477,459 | 458,874 |
| TOTAL | 493,118 | 501,134 |

(*) Information not examined by independent auditors

Contingent liabilities related to the Compulsory Loan issue are shown in the note of provisions for contingencies (Note 28).

158.    On pages F-139-143 of the 2018 Annual Report, under "Item 18. Financial Statements, Note 28 – Provision for Litigation, Provisions for contingencies – Risk of probable

losses," Defendants represent that:

- **<u>Civil</u>**

As of December 31, 2018, the Company and its subsidiaries have civil lawsuits of R$ 22,211,307 (R$ 21,283,131 as of December 31, 2017), which is the probable estimate of outflow of funds to settle these lawsuits.

In civil lawsuits, there are mainly claims for monetary correction of the Compulsory Loan, proceedings arising from payments, fines and charges for alleged delays and defaults, collective actions for putative securities and civil actions associated with the consumption relation, relating to indemnities for moral and material damages arising mainly from irregularities in the measurement of consumption and undue charges according to the main cases described below:

- Monetary Correction Claim concerning the Compulsory Loan

There is an expressive judicial litigation involving Eletrobras, where the largest number of actions in this universe whose purpose is to challenge the criteria for monetary updating of the Compulsory Loan book-entry credits on the consumption of electric energy, determined by the legislation governing the Compulsory Loan and applied by the Company, and the application of inflationary purges arising from economic plans implemented in Brazil.

The credits of the compulsory loan were substantially paid by the Company through the conversions in shares made through the shareholders' meetings held on April 20, 1988, April 26, 1990, April 28, 2005 and April 30, 2008.

<u>The divergence was taken to the Superior Justice Court (STJ), and the merit question was decided by that Court. The matter, however, is currently subject to appeals to the Federal Supreme Court (STF), which are pending judgment.</u>

In spite of the fact that the matter was submitted to the STF, in the light of the precedent of the STJ, ruled under article 543-C of the Code of Civil Procedure of 1973, the lawsuits filed have had their normal course and, consequently, several convictions to the payment of monetary correction differences related to this period have been issued; as a result, Eletrobras has been the target of numerous executions, and in these executions there is no agreement between Eletrobras and the plaintiffs as to how to calculate the amount due.

<u>The most relevant dissent concerns the time lapse in the application of compensatory interest rates of 6% per year.</u> According to the current precedent of the STJ, the burden of the judicial debts (monetary correction from the date of maturity and default interest from the date of the citation, that is, the SELIC (Special System of Settlement and Custody) rate) is imposed on the difference of monetary correction (if applicable), because it is a judicial discussion. <u>In addition,</u>

according to Eletrobras' understanding, consideration must be given to the five-year time limit for payment of compensatory interest, counted from the date of filing of the lawsuit. The Company recognizes the provisions related to these demands in accordance with this understanding, embodied in Special Appeal No. 1003955/RS.

However, in spite of this understanding, the judgment of the Motion for Reconsideration was initiated in Case of Special Appeal number 790288/PR, by the STJ, through which the period of application of compensatory interest is to be reconsidered.

In addition to all of the above, in January 2017, a law firm was hired to analyze the database of the legal action control system. With the result of this work, the Company reviewed data such as dates, amounts paid and/or deposited in court and Compulsory Loan credits executed in the processes as well as loss forecast. The review resulting from the scope of work of contracted legal consulting was completed in 2018 and, on September 30, 2018, based on the Company's best expectations, the claims filed by the plaintiffs of these lawsuits were reviewed, and the impact was an increase in the provision in the amount of R$ 1,389,756.

Also in 2018 regarding the criteria used to calculate the provision of lawsuits classified as probable was the change in the order used to settle the components of the provision, since there are payments made by Eletrobras during these proceedings, even prior to its final and definite decision, as installments considered judicially uncontroversial. In this sense, it was verified the formation of favorable jurisprudence to the Company, in the sense that upon the payment of installments of the judicial debt, compensatory interest should first be considered paid, when they are net debts and expired at the same time, since they are more onerous for the Company than the default interest on the entire judicial debt basis. Accordingly, in 2018, the Company reassessed the criterion of imputation of payments made, within the context of the judicial proceedings provided for, in the sense that the imputation is made, first, for the payment of compensatory interest before the default interest, generating a net positive effect, for the income statement, of approximately R$ 467,630 (reversion of R$ 759,879 and update of R$ 292,249).

The Company maintains a provision for these civil contingencies in the amount of R$ 17,941,912 as of December 31, 2018 (R$16,596,267 as of December 31, 2017).

159.    On page F-148 of the 2018 Annual Report, under "Item 18. Financial Statements,

Note 28 – Provision for Litigation, Contingent liabilities – Risk of possible losses," Defendants

represent that:

**Contingent Liabilities - Risk of possible losses**

- **<u>Civil</u>**

On December 31, 2018, the Company and its subsidiaries have civil lawsuits of R$ 38,627,648 (R$ 52,856,459 as of December 31, 2017), and their probability of loss is possible, where no provision is made.

- Compulsory Loan —monetary correction criteria

These civil lawsuits in the Company have as their objective the application of monetary restatement criteria concerning booked credits of the Compulsory Loan constituted since 1978.

The purpose of the lawsuits is to challenge the calculation method of monetary restatement determined by the legislation governing the Compulsory Loan and applied by the Company. The credits were substantially paid by the Company through stock conversions using current legislation as a basis for restatement.

The total value of the possible lawsuits, including the conversions of credits by the equity value, on December 31, 2018, is R$ 3,872,305 (R$ 4,229,555 on December 31, 2017).

160.    Finally, on pages F-202-203 of the 2018 Annual Report, under "Item 18. Financial

Statements, Note 47 – Subsequent Events," Defendants represent that:

47.7 - Compulsory Loan - judgment in Special Appeal number 790288/PR, by the Superior Court of Justice – STJ

According to Note 23, the divergence surrounding judicial proceedings that seeks to challenge the criteria for monetary updating of the book-entry claims of the Compulsory Loan and the application of the inflationary purges arising from various economic plans implemented in Brazil was brought before the Superior Court of Justice - STJ, and the question of merit was decided by that Court, through the repetitive appeal embodied in Resp. 1003955/RS. <u>The matter of difference in monetary restatement, however, is also subject to appeals to the Federal Supreme Court (STF), which are pending judgment.</u>

In spite of the fact that the matter was submitted to the STF, in view of the precedent of the STJ, the lawsuits filed have taken their normal course and, as a result, several convictions have been filed for the payment of monetary correction and remuneration interest of 6% per annum, the latter as a reflection of monetary correction differences. As a result of these differences, Eletrobras has been the target of executions, and there is a disagreement with the plaintiffs as to how to calculate the amount owed. Eletrobras recorded a provision of approximately

R$ 17,941,912 on the base date of December 31, 2018, of which: (i) R$ 6,372,806 of difference of principal resulting from the monetary restatement criterion, (ii) R$ 1,741.409 of reflecting compensatory interest; and, (iii) R$ 9,827,697 of default interest, notably the SELIC rate.

The most relevant controversy concerns the continuity of the application of compensatory interest rates of 6% per annum, after the conversion meeting. According to the current precedent of the STJ, on the difference of monetary correction calculated on the date of the conversion meeting (if there is one), since this is a judicial discussion, the charges for the judicial debts, i.e. IPCA-E up to the beginning of the incidence of SELIC. This is calculated on the amount of the principal, from the conversion meeting or date of the citation, whichever is the latest and, on the amount of the compensatory interest, it is calculated from the salary or summons in the judicial process, whichever is the most recent. The Company, except for specific judicial determination, adopts this understanding, embodied in Resp. 1003955/RS.

However, the judgment of the Motion for Reconsideration in Special Appeal number 790288/PR, by the STJ, was initiated, through which the plaintiff intends to discuss again the final term of application of the reflecting compensatory interest. In this judgment, the adverse party claims that they be applied to the credits arising from the judicial decisions of the compulsory loan, arising from differences in inflationary purges, interest rates of 6% (six percent) per annum, continuously from the 143rd Extraordinary General Meeting, dated June 30, 2005, which approved the 3rd conversion of credits resulting from the compulsory loan.

In the scope of the judgment of the Motion for Reconsideration in Special Appeal number 790288/PR, not yet concluded in the STJ, there was already a vote by 6 of the 10 Ministers, as communicated to the market on February 28, 2019, with 4 votes against the understanding of Eletrobras and the current precedent of the STJ itself embodied in Resp. 1003955/RS, and 2 votes in favor.

It should be noted that the matter has already been fully adjudicated by the STJ, through ERESP 826809/RS by the 1st Section in 2011, recognizing the limitation of the application of compensatory interest after conversion, due to the impediment of the accumulation of interest provided in the repetitive Resp. 1003955/RS.

It is important to clarify that this is a judgment in divergence that is affected by the specific process, not having a repetitive nature, that is, it cannot be considered, at this moment, as sufficient to alter the calculation parameters of all the processes that deal with the subject, therefore, not determinant to influence the estimate made by the Company's Management in relation to the provision now recognized in these Financial Statements.

However, considering that the matter now at trial, depending on its outcome, may have a reflex on the current repetitive appeal (Resp.1003955/RS), the matter may

64

still be subject to specific appeal in the future, for clarification as to its extent, application or not of concomitant default and evaluation of the constitutionality of the ruling.

However, if there is a change in the current jurisprudence of the STJ to the detriment of Eletrobras with respect to the application of remunerative interest after the conversion meeting, the estimate of the provision, now recognized by the Management, may change.

It is important to point out that eventual impact assessments should only be carried out after the conclusion of the Motion for Reconsideration in Special Appeal number 790288/PR.

### a.    Statements Regarding Liability for Interest

161.    In the 2018 Annual Report, Defendants represent that the annual interest due on the remaining Compulsory Loan Credits (that have not been converted into shares) is due at 6% only after 2008:

> The balance of the remaining Compulsory Loans, after the fourth conversion into shares, relates to credits from 1988 to 1994, is recorded in current and noncurrent liabilities, payable from 2008 at the rate of 6% per year to the date of their conversion into shares, plus monetary adjustment based on the variation of the IPCA-E - Special Extended Consumer Price Index, corresponding, on December 31, 2018, to R$493.1 million (R$501.1 million on December 31, 2017), of which R$477.5 million are noncurrent assets (R$458.9 million on December 31, 2017).

> \* \* \*

> The balance of the remaining Compulsory Loan, after the 4th conversion into shares, relating to credits constituted from 1988 to 1994, is recorded in current and non-current liabilities, payable as from 2008, and remunerated at the rate of 6% per annum until the date of its conversion into shares, plus monetary restatement based on the variation of the Special Consumer Price Index (IPCA-E), and corresponds to R$ 493,118 at December 31, 2018 (R$ 501,134 on December 31, 2017), of which R$ 477,459 in non-current assets (R$ 458,874 on December 31, 2017).

(2018 Annual Report, pp. 24, F-128.)

162.    This statement falsely suggests that the 6% annual interest is due only after 2008. However, as Defendants know, under Law No. 1,512/76, interest is due as of January 1 of the year

subsequent to when the loaned amount was deducted from the consumers' electric bills by Eletrobras.

163.    Defendants' statements also omit the fact that the 2009 STJ Decision determined that, for the portion of the Compulsory Loan Credits that had not been repaid or converted into stocks, there should be payment by Eletrobras of 6% interest up until the date of actual payment, plus default interest based on the SELIC rate (as opposed to just a monetary adjustment). The SELIC rate has consistently been very high in Brazil and, in fact, is one of the highest rates in the world. SELIC is always higher, and often much higher, than monetary adjustment.[34]

164.    Finally, as noted above (*supra* ¶¶ 8, 106-109), the 2019 STJ Decision confirmed that, for the portion of the Eletrobras Compulsory Loan Credits not repaid or converted into stock, interest should be charged at 6%, plus the SELIC rate,  until the date of actual payment (or conversion) of the Credits. Nonetheless, as noted above and discussed further below, Eletrobras has not amended its Financial Statements and, to the contrary, has affirmatively stated that it does not intend to change its provisioning as a result of the 2019 STJ Decision.  *Infra* ¶¶ 184-185, 194, 200, 205.

165.    Through these false and/or misleading statements, Defendants are knowingly and/or recklessly misstating and underreporting Eletrobras' liabilities in connection with the Compulsory Loan Credits, thereby falsely reducing the value of the Compulsory Loan Credits and correspondingly falsely inflating the value of Eletrobras' common and preferred stock and ADRs, making it impossible for all of Eletrobras' securities holders to accurately value their securities, and harming all of Eletrobras' security holders.

---

[34]    For example, between 2002 and 2005 the difference between monetary adjustment and SELIC averaged approximately 11.5% per year. If inflation in that period was 5% per year on average, the SELIC rate would on average be around 16.5%.

b.      **Statements Regarding the Nature and Extent of the Compulsory Loan Credit Litigation**

166.    In the 2018 Annual Report, Defendants also misstate the myriad legal issues being litigated against Eletrobras in connection with the Compulsory Loan Credits and downplay the matters at issue by (a) suggesting that the sole topic being litigated in these cases is the criteria for monetary adjustment of the Compulsory Loan Credits and (b) suggesting that the issue can be appealed to the Federal Supreme Court ("STF"):

> In addition, there is litigation related to the Compulsory Loans challenging the criteria for monetary adjustment of the book-entry credits on electricity consumption, which were determined by the legislation and applied by us, as well as the application of inflationary adjustments arising from the economic plans implemented in Brazil.

> The matter was decided by the STJ, but is currently subject to appeal to the Federal Supreme Court (STF). While this appeal is pending, we and the claimants have agreed on the method to calculate the amounts owed.

> The most relevant issue concerns the time gap of the application of interest rates of 6% per year.

> * * *

> Lawsuits relating to Compulsory Loans challenge the criteria for monetary adjustment of the book-entry credits on electricity consumption, which were determined by the legislation and applied by us, as well as the application of inflationary adjustments arising from the economic plans implemented in Brazil.

> The matter was decided by the STJ, but is currently subject to appeal to the Federal Supreme Court (STF). While this appeal is pending, we and the claimants have agreed on the method to calculate the amounts owed.

> * * *

> There is an expressive judicial litigation involving Eletrobras, where the largest number of actions in this universe whose purpose is to challenge the criteria for monetary updating of the Compulsory Loan book-entry credits on the consumption of electric energy, determined by the legislation governing the Compulsory Loan and applied by the Company, and the application of inflationary purges arising from economic plans implemented in Brazil.

* * *

The divergence was taken to the Superior Justice Court (STJ), and the merit question was decided by that Court. The matter, however, is currently subject to appeals to the Federal Supreme Court (STF), which are pending judgment.

In spite of the fact that the matter was submitted to the STF, in the light of the precedent of the STJ, ruled under article 543-C of the Code of Civil Procedure of 1973, the lawsuits filed have had their normal course and, consequently, several convictions to the payment of monetary correction differences related to this period have been issued; as a result, Eletrobras has been the target of numerous executions, and in these executions there is no agreement between Eletrobras and the plaintiffs as to how to calculate the amount due.

The most relevant dissent concerns the time lapse in the application of compensatory interest rates of 6% per year.

* * *

The matter of difference in monetary restatement, however, is also subject to appeals to the Federal Supreme Court (STF), which are pending judgment.

In spite of the fact that the matter was submitted to the STF, in view of the precedent of the STJ, the lawsuits filed have taken their normal course and, as a result, several convictions have been filed for the payment of monetary correction and remuneration interest of 6% per annum, the latter as a reflection of monetary correction differences. As a result of these differences, Eletrobras has been the target of executions, and there is a disagreement with the plaintiffs as to how to calculate the amount owed. Eletrobras recorded a provision of approximately R$ 17,941,912 on the base date of December 31, 2018, of which: (i) R$ 6,372,806 of difference of principal resulting from the monetary restatement criterion, (ii) R$ 1,741.409 of reflecting compensatory interest; and, (iii) R$ 9,827,697 of default interest, notably the SELIC rate.

The most relevant controversy concerns the continuity of the application of compensatory interest rates of 6% per annum, after the conversion meeting. According to the current precedent of the STJ, on the difference of monetary correction calculated on the date of the conversion meeting (if there is one), since this is a judicial discussion, the charges for the judicial debts, i.e. IPCA-E up to the beginning of the incidence of SELIC. This is calculated on the amount of the principal, from the conversion meeting or date of the citation, whichever is the latest and, on the amount of the compensatory interest, it is calculated from the salary or summons in the judicial process, whichever is the most recent. The Company, except for specific judicial determination, adopts this understanding, embodied in Resp. 1003955/RS.

(2018 Annual Report, p. 24, 134, F-141, F-202.)

167.     However, as outlined below, there are at least three other relevant topics being litigated in the Compulsory Loan Credit Lawsuits that have a material effect on Eletrobras' potential liabilities under the Compulsory Loan Credits. Further, the matter is definitively not subject to further appeal before the STF.

168.     First, Eletrobras' creditors have claimed in court that monetary adjustment of Compulsory Loan Credits should be applied to the window period between the "disbursement" of the loans to Eletrobras and the actual formalization of the Credits, which – under article 2 of Law 1,512/1976 – would only take place on January 1 of the year following the "disbursement."[35] By way of illustration, if, on March 1, 1980, Eletrobras included an additional $100 in the consumer's electric bill as a Compulsory Loan, the loan would be "disbursed." However, the Compulsory Loan Credit would only be deemed "constituted" on January 1, 1981. Because Eletrobras only started to adjust the loaned amounts for inflation after January 1, 1981, if between March 1, 1980 and January 1, 1981, inflation was 100% (a very close estimate, because annual inflation in 1980 was

---

[35]     Law No. 1,512/1976, article 2, provides: "The amount of the contributions of each industrial consumer, calculated on the consumption of electricity in each year, will constitute on January 1 of the following year . . . ."

110%),[36] the real value of the consumer's Compulsory Loan Credit would already have been reduced by half (because the credit was only formalized nine months after it was charged to the consumer). What consumers claim in the Compulsory Loan Credit Lawsuits, therefore, is the monetary adjustment for this 9-month interval during which the nominal value of the Compulsory Loan Credit remained unadjusted for inflation, plus the ensuing interest on the adjusted amount. The STJ has agreed with the consumers' position in several cases – none of which are disclosed or even acknowledged by Eletrobras. (*See*, *e.g.*, STJ Special Appeals Nos. 1.003.955/RS (2009) and 1.028.592/RS (2009).).

169.    <u>Second</u>, the STJ, in Special Appeal No. 1.003.955/RS (2009), has determined that there should be monetary adjustment of the interest due on the Compulsory Loan Credit for the period between the legal "constitution" of the Credit (on January 1) and the beginning of the payment of interest rates.[37] By way of illustration, if, on January 1, 1981, Eletrobras formalized a Compulsory Loan Credit for a consumer in the amount of $100, payment of interest was made only in July 30, 1981, and inflation between January 1, 1980 and July 30, 1981 was 30% (again, a

---

[36]    The table below shows annual inflation in Brazil during the relevant time period:

| Anos 70 | | Anos 80 | |
|---|---|---|---|
| Ano | % | Ano | % |
| 70 | 19,3 | 80 | 110 |
| 71 | 19,5 | 81 | 95 |
| 72 | 15,7 | 82 | 99 |
| 73 | 15,6 | 83 | 211 |
| 74 | 26,9 | 84 | 223 |
| 75 | 29,3 | 85 | 235 |
| 76 | 46,3 | 86 | 65 |
| 77 | 38,8 | 87 | 15 |
| 78 | 40,7 | 88 | 1.037 |
| 79 | 77,3 | 89 | 1.782 |

[37]    From 1976 to 1983, interest was paid in the month of July, pursuant to article 2 of Law No. 1,512/1976. Thereafter, it was paid in monthly installments pursuant to article 3 of Law 7,181/1983.

reasonable estimate because in 1981, annual inflation was 95%), a part of the consumer's semi-annual interest on the Credit would have been eaten up by inflation.

170.    <u>Third</u>, Defendants' representation that, in the Compulsory Loan Credit Lawsuits, "[t]he most relevant issue concerns the time gap of the application of interest rates of 6% per year" is also false. The most relevant topic is not the time gap of application of interest rates of 6% per year, but rather the time gap for application of monetary adjustment of Compulsory Loan Credits. During years of high- or hyper-inflation, a rate of 6% interest would be dwarfed by the prospect of monetary adjustment at much higher rates. In the late 1970s, annual inflation in Brazil started to dramatically increase and, in the 1980s, reached hyperinflation. This is why monetary adjustment is such an important – and expensive – issue for Eletrobras.

171.    <u>Fourth</u>, and perhaps most important, Defendants' representations that these issues are "subject to appeal to the Federal Supreme Court" are knowingly and recklessly misleading because they imply that the issue is going to be resolved by the STF and that Eletrobras may yet prevail in that forum. However, it will not, as the issue is outside of the STF's constitutional purview and (unsurprisingly) the STF has unequivocally stated that it will not rule on the issue. Indeed, in Interlocutory Appeal ("Agravo de Instrumento") No. 735.933/RS, decided on October 21, 2010, the STF held that "the controversy surrounding the criteria for monetary adjustment of repayment of compulsory loan on electricity created by Law 4156/62 is not a constitutional question . . . which is why the appeal cannot be accepted." The STF also added "criteria for monetary adjustment of repayment of compulsory loan on electricity" to its list of "themes" (which operates similarly to *stare decisis*) that it will not address.

172.    More specifically, the STF website contains a compendium of issues, called "themes" ("temas," in Portuguese), that are often appealed to the STF. The list distinguishes

between two types of themes:  those that have "general repercussions" and those that do not. Topics listed as having no general repercussions will not be ruled on by the STF through an extraordinary appeal, which is one of the standard means of access to the STF. This is because one of the constitutional requirements for the STF to rule on an extraordinary appeal is that the issue have general repercussions. (*See* art. 102, § 3, of the Federal Constitution; C.P.C. art. 543-A (1973); and C.P.C. art. 1,030, I, "a" (2013)).  Theme 319, which is listed as being <u>not</u> of general repercussion, is "criteria for monetary adjustment of repayment of compulsory loan on electricity." Accordingly, the STF will not rule on this issue.

173.    Nonetheless, despite the STF's past ruling and its placement of this specific issue on its list of themes that it will not entertain, Eletrobras continues to appeal to the STF from STJ decisions  on these issues – so far, to no avail – and, more importantly, to represent that it is doing so in ***an apparent attempt to mislead investors about its chances of overturning otherwise settled law against it***.

174.    Through these false and/or misleading statements, Defendants are knowingly and/or recklessly misstating and underreporting Eletrobras' liabilities in connection with the Compulsory Loan Credits, thereby falsely reducing the value of the Compulsory Loan Credits and correspondingly falsely inflating the value of Eletrobras' common and preferred stock and ADRs, making it impossible for all of Eletrobras' securities holders to accurately value their securities, and harming all of Eletrobras' security holders.

### c.       Defendants' Use of the UP Index

175.    In the 2018 Annual Report, Defendants also purport to selectively use an index for monetary adjustment – named the "UP" (or "unidade padrão") – that they know understates inflationary losses. Lack of monetary adjustment for inflation, or use of a bogus index such as the

UP, causes losses to creditors. Indeed, for this reason, many of Eletrobras' creditors have challenged these tactics in court, often successfully (*see, e.g.,* STJ Special Appeals Nos. 1.003.955/RS and 1.028.592/RS, both from 2009).

176.    Through their misleading reliance on this index, Defendants are knowingly and/or recklessly misstating and underreporting Eletrobras' liabilities in connection with the Compulsory Loan Credits, thereby falsely reducing the value of the Compulsory Loan Credits and correspondingly falsely inflating the value of Eletrobras' common and preferred stock and ADRs, making it impossible for all of Eletrobras' securities holders to accurately value their securities, and harming all of Eletrobras' security holders.

### d.    Financial Statements Regarding Liabilities

177.    Finally, as a result of the false and/or misleading statements outlined above, Eletrobras' Financial Statements, which are attached as Item 18 to the 2018 Annual Report, are likewise false and/or misleading and/or omit material facts, in that they downplay and minimize Eletrobras' obligations under the Compulsory Loan Credits.

178.    Specifically, as outlined above (*supra* ¶¶ 155-165), in the 2018 Annual Report, Eletrobras' provisions for the Compulsory Loan Credits are directly contrary to the 2019 STJ Decision:

> The most relevant issue concerns the time gap of the application of interest rates of 6% per year. Based on the current STJ precedent, the SELIC rate applied to the difference of monetary restatement (if any), as there are charges for judicial debts (monetary restatement is applied from the date of maturity and default interest is applied from the date of determination). In addition, we believe that consideration must be given to the five-year time limit for payment of compensation interest, as of the date of the lawsuit filing. **We make provisions for these claims in accordance with this understanding, substantiated in Special Appeal 1003955/RS.**
>
> Despite our understanding, on February 27, 2019, the STJ re-opened a judgment of the Embargo de Divergência em Agravo in Special Appeal No. 790288/PR to

reconsider the applicable period for remunerative interest. The claimant argues that the credits arising from the judicial decisions from differences in inflationary adjustments should apply continuously at 6% per year from the 143rd Extraordinary General Meeting on June 30, 2005.

Of the ten judges, four have voted against our position, two in favor, and four have yet to deliver their decisions. If the claimants prevail in this judgment, we believe it is fact specific and may not be applicable to other Compulsory Loan litigation. **Therefore, we have not changed our provision relating to Compulsory Loan litigation.** In addition, any outcome of the current reconsideration by the STJ may be subject to appeal.

However, if there is a change in the ruling of the STJ against us, specifically referring to the application of remunerative interest after the conversion meeting, the estimate of the provision, now recognized by Management, may change.

**As of December 31, 2018, we had provisioned R$17.9 billion to cover losses arising from unfavorable decisions relating to these lawsuits.** Despite our efforts to reduce losses related to these lawsuits, we cannot ensure that we will succeed, and if we are not successful, it could adversely affect our financial condition and our results of operations.

(2018 Annual Report, pp. 24-25); *see also supra* ¶ 160 (citing 2018 Annual Report, pp. F-202-203 (same)).

179.    However, as outlined above, *supra* ¶¶ 106-111, the 2019 STJ Decision specifically repudiated Eletrobras' understanding and found to the contrary, confirming that Defendants falsely minimized Eletrobras' liabilities under the Compulsory Loan Credits in the 2018 Annual Report, and that billions of dollars under the Compulsory Loan Credits have not been properly disclosed. What is more, as again outlined above, that decision is likely binding, if not highly persuasive. *Supra* ¶ 110. *Id.* Indeed, Eletrobras' current "understanding" is similarly based on an STJ appeal – namely, Special Appeal 1003955/RS.

180.    Despite the landmark 2019 STJ Decision, as outlined below, Defendants have affirmatively stated that they do not intend to change Eletrobras' treatment of its Compulsory Loan Obligations in its current or future financial statements and securities filings. In so doing, they

have affirmatively contradicted their own past statements recognizing that such a change might be necessary:

> However, if there is a change in the ruling of the STJ against us, specifically referring to the application of remunerative interest after the conversion meeting, the estimate of the provision, now recognized by Management, may change.

(2018 Annual Report, p. 25); *see also supra* ¶ 160 (citing 2018 Annual Report, pp. F-202-203 (same)).

181.    For these reasons, Defendants' failure to update Eletrobras' Financial Statements to reflect its increased Compulsory Loan Credit Obligations renders those Financial Statements materially false and/or misleading, in that they materially underreport the Company's current and non-current liabilities. Through these false and/or misleading statements, Defendants are knowingly and/or recklessly misstating and underreporting Eletrobras' liabilities in connection with the Compulsory Loan Credits, thereby falsely reducing the value of the Compulsory Loan Credits and correspondingly falsely inflating the value of Eletrobras' common and preferred stock and ADRs, making it impossible for all of Eletrobras' securities holders to accurately value their securities, and harming all of Eletrobras' security holders.

182.    What is more, by failing to adhere to the applicable accounting standards outlined above (*supra* ¶¶ 144-146, 150), Defendants' representation that Eletrobras' Financial Statements are "prepared . . . in compliance with International Financial Reporting Standards ('IFRS') as issued by the International Accounting Standards Board ('IASB')" is further false and/or misleading.

### B.    FALSE AND/OR MISLEADING STATEMENTS AND/OR MATERIAL OMISSIONS IN THE JUNE 12 MARKET ANNOUNCEMENT

183.    As noted above (*supra* ¶¶ 106-110), in the 2019 STJ Decision, the STJ found in favor of a creditor of an Eletrobras Compulsory Loan Credit, holding that, in accordance with Law

No. 1,512/76, Eletrobras must pay interest of 6% per year until the date of actual payment (or conversion into shares) of the Compulsory Loan Credits.  The Court rejected Eletrobras' position that interest would accrue only until June 30, 2005.

184.    Despite this landmark ruling, Defendants have stated that they do not intend to change Eletrobras' treatment of its Compulsory Loan Obligations in its prior or future financial statements or securities filing and, worse, have made new false and/or misleading statements regarding the 2019 STJ Decision itself.

185.    Specifically, immediately following the announcement of the 2019 STJ Decision, Eletrobras issued a June 12, 2019 "Market Announcement," in which it stated:

> **Centrais Elétricas Brasileiras S/A** ("Company" or "Eletrobras") (B3: ELET3, ELET5 & ELET6; NYSE: EBR & EBR.B; LATIBEX: XELT.O & XELT.B) hereby informs its shareholders and the market in general, in addition to the Market Announcement of September 14, 2018 and February 28, 2019, that on this date the judgment of the of the Motion for Reconsideration in Review in Special Appeal number 790288/PR, by the Superior Court of Justice ("STJ"), being provided in favor of the creditor of the electric energy compulsory loan.
>
> The referred appeal dealt with compulsory loan, specifically with regard to criteria related to the final term for calculating compensatory interest of 6% per annum on any credits discussed in the lawsuits in which the Company is listed on the passive pole.
>
> However, Eletrobras understands that the credits were paid in accordance with its own legislation, and the debts under discussion deal with judicial debts and no more deal with taxes. Therefore, it is necessary to apply the correction with own charges of judicial debts, in observance of Resources Numbers RESP 1.003.955/RS and ERESP 826809/RS, without interest of 6% per year.
>
> The Company informs that will continue in the judicial discussion through the appropriate remedies. Therefore, we will await the publication of the judgment through the Official Gazette and **we clarify that, at this moment, there are no elements for the decision handed down in the STJ to change the amounts already provisioned for the Compulsory Loan of Electric Energy processes, considering that, according to the understanding of the legal department of Eletrobras, today's judgment affects only the**

**lawsuit in question, and does not have an automatic effect for the other proceedings provided for.**

The Company will keep the market informed about the judgment in question.

186.     The June 12 Market Announcement was subsequently filed with the SEC on June 13 by way of Form 6-K, which was signed by Defendant Presta.

187.     Therein, Defendants make new false and/or misleading statements regarding their liability in connection with the Compulsory Loan Obligations and the 2019 STJ Decision itself. Specifically, as outlined above, *supra* ¶ 185, Defendants seek to justify their failure to update their accounting  on the grounds that, "according to the understanding of the legal department of Eletrobras, today's judgment affects only the lawsuit in question, and does not have an automatic effect for the other proceedings provided for."

188.     This statement is false and/or misleading because it falsely states that the decision – in the opinion of Eletrobras' legal department, at least – will not have precedential effect. However, the official STJ summary of the opinion (which preceded the official, September 2, 2019 publication of the 2019 STJ Decision itself) plainly states that:

**Eletrobras will have to pay 6% interest on compulsory loan amounts not converted into shares**

The First Chamber of the Superior Court of Justice (STJ), by five to four votes, ruled that the amounts owed by Eletrobras as a result of the compulsory loan on electricity consumption - but which were not converted into shares - should be accrued interest. 6% per annum (pursuant to article 2 of Decree-Law 1.512 / 1976) until the date of actual payment.

The divergence originated after the ruling of the Second Panel of the STJ determined that the interest in question should be calculated in the same way as that applied to judicial debts - an understanding contrary to that defined by the First Section in the judgment of Theme 64 of repetitive appeals, which distinguished amounts converted into shares of the remaining balance.

On that occasion, the section concluded that, having paid off part of the compulsory loan through the conversion of taxpayers' credits into shares, the

remaining balance should be remunerated in accordance with Decree-Law 1.512 / 1976, that is, by applying interest of 6% until the date of actual payment to consumers.

### *Consolidated case law*

*In his vote, the rapporteur minister of the divergence embargoes, Gurgel de Faria, stressed that the best understanding to be adopted is that of the repetitive of the First Section.* The magistrate also demonstrated the need to distinguish between the balance converted into shares and the balance that was not converted, as the remuneration impact is different in each situation.

"It is necessary to differentiate the amounts converted into shares from the unconverted balance, since, in the case of amounts that were not converted into shares at the extraordinary general meeting, there is no change in the nature of the credit. The creditor does not become a shareholder, "he said.

The rapporteur stressed that, as for the amounts not converted into shares, the debt remains, applying interest of 6% per year, percentage defined for the compulsory loan.

"The creditor remains a creditor and, therefore, his credit (in this unconverted part) is subject to the criteria of the compulsory loan: remuneration interest until the amount is actually paid or will be converted into shares, pursuant to Articles 2 and 2. 3 of DL 1.512 / 1976," said Gurgel de Faria.

### Convergence

*The magistrate also stated that, contrary to Eletrobras' allegations, the STJ's decision in EREsp 826,809 is in accordance with the repetitive's judgment, and this precedent does not exempt the company from the payment of remuneration interest until the settlement of the credits.*

"It should be noted that the precedent invoked by the National Treasury, EREsp 826.809 / RS, does not contradict this understanding, given that the ruling concluded that 'the interest (or compensatory) interest of 6% per year provided for in the legislation of the compulsory loan on the consumption of electric energy must focus until the date [...] of the effective conversion in shares, in the form of articles 2 and 3 of Decree-Law 1.512 / 1976, respectively '.

(bold                     in                     original)                     (*available                     at*

http://www.stj.jus.br/sites/portalp/Paginas/Comunicacao/Noticias/Eletrobras-tera-que-

pagar-juros-de-6--sobre-valores-de-emprestimo-compulsorio-nao-convertidos-em-

acoes.aspx) (last visited Oct. 9, 2019) (translated using Google Translate).

189.    The STJ's decision to consolidate case law and label the 2019 STJ Decision as a "convergence opinion" indicates an intent to imbue the opinion with precedential effect. And, even if the 2019 STJ Decision did not specifically state that it was resolving conflicting case law, it indicates a significant shift in the STJ's position regarding when interest is due under the Compulsory Loan Obligations, and it is therefore highly likely that the STJ will apply this same position to other lawsuits involving this exact same issue, thereby increasing the amount owed by Eletrobras to creditors.

190.    What is more, Defendants' refusal to change Eletrobras' treatment of its Compulsory Loan Obligations in its current and prior financial statements and securities filings contradicts their own past statements recognizing that such a change might be necessary:

> However, if there is a change in the ruling of the STJ against us, specifically referring to the application of remunerative interest after the conversion meeting, the estimate of the provision, now recognized by Management, may change.

2018 Annual Report, p. 25; *see also supra* ¶ 160 (citing 2018 Annual Report, pp. F-202-203 (same)).

191.    Finally, and perhaps most importantly, as outlined above, *supra* ¶¶ 121-124 Defendants rely almost exclusively on past (unbinding) STJ decisions in justifying their failure to recognize Eletrobras' liabilities in connection with the Compulsory Loan Obligations. It is contradictory and misleading, at best, for Defendants to describe those non-binding decisions as carrying precedential weight when doing so allows them to avoid reporting Eletobras' liabilities, but to now fail to recognize a decision with actual precedential weight because it was rendered against Eletrobras.

192.    For these reasons, Defendants' description of the 2019 STJ Decision is false and/or

misleading. Through these false and/or misleading statements, Defendants are knowingly and/or recklessly misstating and underreporting Eletrobras' liabilities in connection with the Compulsory Loan Credits, thereby falsely reducing the value of the Compulsory Loan Credits and correspondingly falsely inflating the value of Eletrobras' common and preferred stock and ADRs, making it impossible for all of Eletrobras' securities holders to accurately value their securities, and harming all of Eletrobras' security holders. Eletrobras' affirmative denial of its full liability under the Compulsory Loan Obligation's in the face of authority to the contrary and its refusal to fully provision for them is material to the value of the Company.

### C.    FALSE AND/OR MISLEADING STATEMENTS AND/OR MATERIAL OMISSIONS IN THE 2Q19 MARKETLETTER

193.    On August 14, 2019, Defendants filed with the SEC, on Form 6-K, Eletrobras' "2Q19 Marketletter," which was signed by Defendant Presta.

194.    Consistent with Defendants' statement in the June 12 Market Announcement that Eletrobras would ignore the 2019 STJ Decision and would not change its treatment of its Compulsory Loan Obligations in its prior or future financial statements or securities filings, in the 2Q19 Marketletter (which is similar to a quarterly report), Defendants entirely omitted any mention of the 2019 STJ Decision and, worse, made absolutely no changes to Eletrobras' balance sheet to reflect the Decision or the effect it should have on Eletrobras' liabilities in connection with its Compulsory Loan Obligations:



**Marketletter 2Q19**

| Liabilities and Equity | Parent Company 06.30.2019 | 12.31.18 | Consolidated 06.30.2019 | R$ mil 12.31.18 |
|---|---|---|---|---|
| **CURRENT** | | | | |
| Loans and financing | 9,229,546 | 7,031,515 | 11,080,247 | 12,066,912 |
| Debentures | 39,630 | 0 | 81,593 | 36,073 |
| Compulsory loan | 14,778 | 15,659 | 14,778 | 15,659 |
| Suppliers | 680,916 | 569,218 | 2,921,077 | 3,360,550 |
| Advances from customers | 670,464 | 357,275 | 739,895 | 421,002 |
| Taxes payable | 253,296 | 166,523 | 1,642,413 | 1,277,051 |
| Income tax and social contribution | 16,092 | 917,734 | 2,308,312 | 2,953,072 |
| Onerous contracts | 0 | 0 | 3,914 | 9,436 |
| Remuneration to shareholders | 1,293,562 | 1,257,502 | 1,298,832 | 1,305,633 |
| Financial liabilities - Concessions and Itaipu | 745,957 | 799,401 | 0 | 0 |
| Estimated liabilities | 99,736 | 134,474 | 1,497,287 | 1,366,376 |
| Reimbursement Obligations | 1,842,639 | 1,250,619 | 1,842,639 | 1,250,619 |
| Post-employment benefits | 14,550 | 29,336 | 159,822 | 164,160 |
| Provisions for contingencies | 786,255 | 850,828 | 865,628 | 931,364 |
| Regulatory charges | 0 | 0 | 624,722 | 653,017 |
| Lease | 7,475 | 0 | 231,367 | 152,122 |
| Accounts payable with subsidiaries | 0 | 2,866,810 | 0 | 0 |
| Derivative financial instruments | 880 | 928 | 920 | 962 |
| Liabilities associated with assets held for sale | 0 | 11,127,717 | 1,715,806 | 10,294,967 |
| Others | 64,155 | 96,496 | 1,465,958 | 264,996 |
| **TOTAL CURRENT LIABILITIES** | **15,759,931** | **27,472,035** | **28,495,210** | **36,523,971** |
| | | | | |
| **NON-CURRENT** | | | | |
| Loans and financing | 26,492,873 | 20,603,333 | 38,893,728 | 42,305,886 |
| Suppliers | 0 | 0 | 16,578 | 16,555 |
| Debentures | 5,000,481 | 0 | 5,426,024 | 421,002 |
| Advances from customers | 0 | 0 | 407,096 | 448,881 |
| Compulsory loan | 469,133 | 477,459 | 469,133 | 477,459 |
| Obligation for asset retirement | 0 | 0 | 2,695,805 | 2,620,128 |
| Fuel Consumption Account - CCC | 0 | 0 | 0 | 0 |
| Provisions for contingencies | 17,511,275 | 17,604,730 | 24,167,818 | 23,196,295 |
| Post-employment benefits | 1,196,286 | 1,196,286 | 3,111,043 | 2,894,949 |
| Provision for unsecured liabilities | 3,994,730 | 3,883,600 | 0 | 0 |
| Onerous contracts | 0 | 0 | 379,564 | 715,942 |
| Indemnification obligations | 0 | 0 | 0 | 0 |
| Lease | 59,771 | 0 | 961,849 | 823,993 |
| Grants payable - Use of public goods | 0 | 0 | 65,128 | 64,144 |
| Advances for future capital increase | 3,992,488 | 3,873,412 | 3,998,443 | 3,873,412 |
| Derivative financial instruments | 0 | 0 | 24,672 | 25,459 |
| Regulatory charges | 0 | 0 | 755,702 | 721,536 |
| Taxes payable | 0 | 0 | 230,655 | 248,582 |
| Income tax and social contribution | 516,262 | 432,582 | 8,503,668 | 8,315,386 |
| Others | 1,605,533 | 1,510,899 | 508,216 | 1,496,527 |
| **TOTAL NON-CURRENT LIABILITIES** | **60,838,832** | **49,582,301** | **90,615,122** | **88,677,289** |
| | | | | |
| **EQUITY** | | | | |
| Share capital | 31,305,331 | 31,305,331 | 31,305,331 | 31,305,331 |
| Capital reserves | 13,867,170 | 13,867,170 | 13,867,170 | 13,867,170 |
| Revenue reserves | 15,887,829 | 15,887,829 | 15,887,829 | 15,887,829 |
| Equity valuation adjustments | 0 | 0 | 0 | 0 |
| Profits (losses) | 6,670,290 | 0 | 6,670,290 | 0 |
| Accumulated other comprehensive income | -5,417,108 | -5,517,424 | -5,417,108 | -5,517,424 |
| Non-controlling shareholders | 0 | 0 | 476,596 | 466,042 |
| **TOTAL SHAREHOLDERS' EQUITY** | **62,313,512** | **55,542,906** | **62,790,108** | **56,008,948** |
| **TOTAL LIABILITIES AND SHAREHOLDERS' EQUITY** | **138,912,275** | **132,597,242** | **181,900,440** | **181,210,208** |

34

Disclaimer:
Este  Este material contém cálculos que podem não produzir uma soma ou resultado preciso devido a arredondamentos realizados

195.    Pursuant to IAS 34, the same accounting policies should be applied for interim reporting as are applied in the entity's annual financial statements, except for accounting policy changes made after the date of the most recent annual financial statements that are to be reflected

in the next annual financial statements. Accordingly, for the same reasons outlined above (*supra* ¶¶ 139-153 and 177-182), Defendants' failure to update Eletrobras' Financial Statements to reflect its increased obligations under the Compulsory Loan Credits renders those Financial Statements materially false and/or misleading, in that they materially underreport the Company's current and non-current liabilities.

196.    What is more, these "updated" Financial Statements are also not maintained in accordance with the relevant international accounting standards. By provisioning for the Compulsory Loan Credits and the Compulsory Loan Credit Lawsuits in connection therewith, Defendants have already admitted, under both the IAS and Eletrobras' own accounting "standards," that they constitute present and contingent liabilities for which the Company must provision. *See supra* ¶¶ 141-142, 155-156, 159-162. However, pursuant to IAS 37, an entity is required to "review and adjust provisions at each balance sheet." Defendants' failure to update Eletrobras' Financial Statements in its 1Q19 Marketletter to reflect its increased Compulsory Loan Credit Obligations again renders those Financial Statements materially false and/or misleading, in that they materially underreport the Company's current and non-current liabilities.

197.    Through these false and/or misleading statements, Defendants are knowingly and/or recklessly misstating and underreporting Eletrobras' liabilities in connection with its Compulsory Loan Obligations, thereby falsely reducing the value of the Bearer Bonds and Compulsory Loan Credits and correspondingly falsely inflating the value of Eletrobras' common and preferred stock and ADRs, making it impossible for all of Eletrobras' securities holders to accurately value their securities, and harming all of Eletrobras' security holders.

198.    What is more, by failing to adhere to the applicable accounting standards outlined above (*supra* ¶¶ 144-146, 150), Defendants' representation that Eletrobras' Financial Statements

are "prepared . . . in compliance with International Financial Reporting Standards ('IFRS') as issued by the International Accounting Standards Board ('IASB')" is further false and/or misleading.

### D. FALSE AND/OR MISLEADING STATEMENTS AND/OR MATERIAL OMISSIONS IN THE SEPTEMBER 2 MARKET ANNOUNCEMENT

199.    As noted above (*supra* ¶ 106), the formal 2019 STJ Decision was released on September 2, 2019. Even after the formal opinion was released, Defendants reiterated the false and/or misleading statements contained within the June 12 Market Announcement.

200.    Specifically, on September 2, 2019, the same day that the full 2019 STJ Decision was published, Defendants issued another Market Announcement (which was subsequently filed with the SEC on June 3, 2019 by way of Form 6-K), in which Defendants stated:

> Centrais Elétricas Brasileiras S/A ("Company" or "Eletrobras") (B3: ELET3, ELET5 & ELET6; NYSE: EBR & EBR.B; LATIBEX: XELT.O & XELT.B) hereby informs its shareholders and the market in general, in addition to the Market Announcement disclosed on June 12, 2019, and in attention of the news published today on the Bloomberg portal, under the title "Eletrobras must pay interest on Compulsory", that there is no new information, besides the publication of the judgment referring to that decision previously disclosed in the above-mentioned announcement, regarding the lawsuit relating to the final term of incidence of remuneration interest of 6% per annum in any credits discussed in the lawsuits in which the Company is a liability.

> All information on this matter is available in Note 4.1.1 – Risks related to the Company, item a) Compulsory Loan – Judgment on Special Appeal no 790288/PR, by the Superior Court of Justice – STJ, of the Financial Statements of the 2nd Quarter disclosed on August 12, 2019.

> **At this moment, there are no elements for the decision handed down in the STJ to change the amounts already provisioned for the Compulsory Loan of Electric Energy processes, considering that, according to the understanding of the legal department of Eletrobras, the judgment affects only the lawsuit in question, and does not have an automatic effect for the other proceedings provided for.**

> Eletrobras will keep the market informed about the subject matter of this

market announcement.[38]

201.    The September 2 Market Announcement was subsequently filed with the SEC on September 3 by way of Form 6-K, which was signed by Defendant Presta.

202.    For the same reasons outlined above in connection with the June 12 Market Announcement (*supra* ¶¶ 183-192), the statements made in the September 2 Market Announcement regarding Eletrobras' liability in connection with the Compulsory Loan Obligations and the 2019 STJ Decision itself are again false and/or misleading.

203.    For these reasons, Defendants' description of the 2019 STJ Decision in the September 2 Market Announcement is false and/or misleading. Through these false and/or misleading statements, Defendants are knowingly and/or recklessly misstating and underreporting Eletrobras' liabilities in connection with the Compulsory Loan Credits, thereby falsely reducing the value of the Compulsory Loan Credits and correspondingly falsely inflating the value of Eletrobras' common and preferred stock and ADRs, making it impossible for all of Eletrobras' securities holders to accurately value their securities, and harming all of Eletrobras' security holders. Defendants' affirmative denial of Eletrobras' full liability under the Compulsory Loan Obligations in the face of authority to the contrary and their refusal to fully provision for them is material to the value of the Company.

### E.    FALSE AND/OR MISLEADING STATEMENTS AND/OR MATERIAL OMISSIONS IN THE AMENDED 2Q19 MARKETLETTER

204.    On September 3, 2019, Eletrobras filed with the SEC, on Form 6-K, an amended "2Q19 Marketletter," which was signed by Defendant Presta.

---

[38]    The September 2 Market Announcement represents that "[a]ll information on [the 2019 STJ Decision] is available in Note 4.1.1 – Risks related to the Company, item a) Compulsory Loan – Judgment on Special Appeal no 790288/PR, by the Superior Court of Justice – STJ, of the Financial Statements of the 2nd Quarter disclosed on August 12, 2019." However, a review of that filing reveals no mention of the Decision.

205.   The Amended 2Q19 Marketletter contained identical Financial Statements regarding the Compulsory Loan Obligations as the original 2Q19 Marketletter and therefore likewise omitted any mention of the 2019 STJ Decision and made absolutely no changes to Eletrobras' balance sheet to reflect the Decision or the effect it should have on Eletrobras' liabilities in connection with its Compulsory Loan Obligations.

206.   Accordingly, for the same reasons outlined above (*supra* ¶¶ 193-198) in connection with the original 2Q19 Marketletter, the Amended 2Q19 Marketletter contains materially false and/or misleading Financial Statements, in that they materially underreport the Company's current and non-current liabilities and are not maintained in accordance with the relevant international accounting standards.

207.   Through these false and/or misleading statements, Defendants are knowingly and/or recklessly misstating and underreporting Eletrobras' liabilities in connection with its Compulsory Loan Obligations, thereby falsely reducing the value of the Bearer Bonds and Compulsory Loan Credits and correspondingly falsely inflating the value of Eletrobras' common and preferred stock and ADRs, making it impossible for all of Eletrobras' securities holders to accurately value their securities, and harming all of Eletrobras' security holders.

208.   What is more, by failing to adhere to the applicable accounting standards outlined above (*supra* ¶¶ 144-146, 150), Defendants' representation that Eletrobras' Financial Statements are "prepared . . . in compliance with International Financial Reporting Standards ('IFRS') as issued by the International Accounting Standards Board ('IASB')" is further false and/or misleading.

## VI. FALSE AND/OR MISLEADING STATEMENTS AND/OR MATERIAL OMISSIONS REGARDING MATERIAL DEFICIENCIES IN ELETROBRAS' INTERNAL CONTROLS

209.    Defendants had a responsibility to establish and maintain adequate internal control over financial reporting, which responsibility they failed to fulfill at all relevant times. Rather, at all relevant times, Defendants knew that Eletrobras' controls were materially deficient and allowed the Company's financial statements to be materially false and/or misleading. Nonetheless, Defendants asserted that Eletobras' financial statements "fairly present in all material respects the financial condition, results of operations and cash flows of the company . . . ."

210.    In the 2018 Annual Report, Defendants concluded that Eletrobras' internal controls over financial reporting were not effective because material weaknesses existed as of December 31, 2018, and that the design and operation of Eletrobras' disclosure controls and procedures were not effective to provide reasonable assurance that all material information relating to Eletrobras was reported as required.

211.    Specifically, regarding the purported adequacy of the Company's Controls and Procedures, page 165 of the 2018 Annual Report stated, in part:

### ITEM 15. CONTROLS AND PROCEDURES

**(a) Disclosure Controls and Procedures**

We carried out an evaluation under the supervision of, and <u>with participation of, our management, including our Chief Executive Officer and Chief Financial Officer</u>, of the effectiveness of the design and operation of our disclosure controls and procedures, including those defined in United States Exchange Act Rule 13a-15e, as of the year ended December 31, 2018. There are inherent limitations to the effectiveness of any system of disclosure controls and procedures, including the possibility of human error and the circumvention or overriding of the controls and procedures. Accordingly, even effective controls and procedures can only provide reasonable assurance of achieving their control objectives.

As a result of this evaluation, <u>*our Chief Executive Officer and Chief Financial*</u>

*Officer concluded that our disclosure controls and procedures were not effective as of December 31, 2018, and that the design and operation of our disclosure controls and procedures were not effective to provide reasonable assurance that all material information relating to our company was reported as required because material weaknesses in the current operation of our internal control over financial reporting were identified as described below*.

**(b) Management's Annual Report on Internal Control over Financial Reporting**

\* \* \*

Our management assessed the effectiveness of our internal controls over financial reporting as of December 31, 2018 . . . . Based on this assessment, our management concluded that, as of December 31, 2018, our internal control over financial reporting was not effective because material weaknesses existed. A material weakness is a control deficiency, or combination of control deficiencies, in internal control over financial reporting such that there is a reasonable possibility that a material misstatement of the annual consolidated financial statements will not be prevented or detected on a timely basis. The material weakness identified was:

> As in previous years, we did not maintain adequate controls regarding the preparation of our financial statements and related disclosures. The matters involved: (i) insufficient involvement of trained personnel on a timely basis, including at relevant subsidiaries; (ii) ineffective general information technology controls (GITC) regarding management and monitoring of privileged accesses; and (iii) *ineffective management review and/or processes level controls over the financial reporting*, where: (a) for continued operations, adoption of IFRS 9 and 15 standards on transmission operations; contingencies, fixed assets, impairments of assets and related accounts; and (b) for discontinued operations, contingencies; accounts payable; accounts receivable; revenue; taxes, and related accounts; were not designed or operating at a sufficient level of precision to identify material misstatements.

212.    However, Defendants also represented that, to improve the situation, they had already begun implementing a process to remediate the material weaknesses regarding the preparation of Eletrobras' financial statements and related disclosures. Notably, as part of that process, the Company specifically represented that it had begun a process to review litigation-

related contingencies in particular:

### Remediation of Material Weakness

Regarding the insufficient involvement of trained personnel, in 2019, we are implementing the GRC-SAP (Governance Risk and Compliance) module, which reviews the control matrices of the processes, reinforcing the COSO-2013 principles for risk owners. Training about IFRS is included in the continuing education program for accountants at all of our companies.

In order to remediate the material weakness regarding the preparation of our financial statements and related disclosures, we are implementing some important initiatives. Regarding the issues of granting and revoking access to the IT system, it originated mainly from an issue of our subsidiary, Eletronuclear, which became part of our unified ERP, starting in 2019, where the concession, revision and revocation of access are now centralized, with strict, well-defined and documented criteria.

\* \* \*

*Regarding contingencies, due to the complexity of the litigation processes, our management began a process of reviewing the systems that support the related operations.*

(2018 Annual Report, p. 166 (bold in original)).

213. Finally, in addition to signing the 2018 Annual Report itself, Defendants Ferreira and Presta also signed Sarbanes Oxley Certifications for the 2018 Annual Report. Therein, despite acknowledging that the Company's financial reporting contained material weaknesses and in direct contravention to those acknowledgments, Defendants Ferreira and Presta purported to certify and attest to the truth, accuracy, and completeness of the entire 2018 Annual Report. These Certifications, which were substantially identical, stated:

1. I have reviewed this annual report on Form 20-F of CENTRAIS ELÉTRICAS BRASILEIRAS S.A.—ELETROBRAS (the "company")

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements and other financial information included in this report fairly present in all material respects the financial condition, results of operations and cash flows of the company as of and for the periods presented in this report;

4. The company's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a- 15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the company and have:

(a) Designed such disclosure controls and procedures or caused such disclosure controls and procedures to be designed under our supervision to ensure that material information relating to the company, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b) *Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles*;

(c) Evaluated the effectiveness of the company's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures as of the end of the period covered by this report based on such evaluation; and

(d) Disclosed in this report any change in the company's internal control over    financial reporting that occurred during the period covered by the annual report that has materially affected, or is reasonably likely to materially affect, the company's internal control over financial reporting; and

5. The company's other certifying officers and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the company's auditors and to the audit committee of the company's board of directors (or persons performing the equivalent function):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the company's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the company's internal control over financial reporting.

2018 Annual Report, Exs. 12.1 and 12.2.

214.    Despite these representations, as outlined above, certain statements contained in Eletrobras' 2018 Annual Report were materially false and/or misleading when made, and/or omitted material facts necessary to make such statements true, accurate and reliable, in light of circumstances that existed at that time, and were known by Defendants to be false at that time, or were recklessly disregarded as such. In other words, while these material weaknesses existed within Eletrobras, investors were told not to worry because Defendants had ensured that at each reporting period Eletrobras had compensated for these deficiencies, providing investors with a false assurance that the Financial Statements were fairly presented, when they were not.

215.    What is worse, the Company's poor internal control environment was designed to enable Defendants to purposely and knowingly misstate and underreport Eletrobras' liabilities in connection with its Compulsory Loan Obligations, thereby falsely reducing the value of the Bearer Bonds and Compulsory Loan Credits and correspondingly falsely inflating the value of Eletrobras' common and preferred stock and ADRs.

216.    Accordingly, Defendants not only failed to maintain a sound internal control environment, but knowingly allowed Eletrobras to issue materially false and/or misleading financial statements because its internal control environment was materially weak. During the relevant time period, Defendants have done virtually nothing to correct or implement adequate internal controls over Eletrobras' financial reporting, compliance with laws and regulations, and the preparation of financial statements in accordance with accepted accounting principles, and therefore had no reasonable basis to state that Eletrobras' Financial Statements were fairly

presented.

## VII.   FALSE AND/OR MISLEADING STATEMENTS AND/OR MATERIAL OMISSIONS REGARDING COMPLIANCE WITH ELETROBRAS' DISCLOSURE POLICY

217.   On July 16, 2019, Eletrobras filed its "Policy of Disclosure and Use of Relevant Information and Negotiation of Eletrobras' Company Securities" on Form 6-K with the SEC (the "Disclosure Policy"), which was adopted by Eletrobras to establish "mandatory practices for the use and disclosure of Relevant Information," in order to "prevent[ ] the undue use of Confidential Information, and ensur[e] the egalitarian treatment of Eletrobras' investors."

218.   To that end, the Disclosure Policy requires Eletrobras, primarily through its Investor Relations Officer or, if necessary, its Chief Executive Officer, to "disclose Relevant Information, as well as ensure its comprehensive and immediate dissemination, simultaneously before CVM, SEC, and all Stock Exchanges."

219.   "Relevant Information" is defined broadly to include, *inter alia*,

any other act or fact of political/administrative, technical, business or economic/financial character, happening or relating to the Company's business, not yet disclosed to the capital market, which may influence:

   (i)    The quote of securities issued by the Company or referred to by them;

   (ii)    The decision-making by investors to purchasing, selling or keeping securities; or

   (iii)    The decision-making of investors to exercising any rights inherent in the status of holders of securities issued by the Company or referred to by them.

220.   The Disclosure Policy further provides that disclosure of Relevant Information "should be performed in a clear, precise, straightforward, reliable, and timely manner, with quality, transparency, truthfulness, completeness, and consistency. . . ."

221.   In the 2018 Annual Report, Defendants state that Eletrobras "observe[s]" the

Disclosure Policy.  (2018 Annual Report, p. 148.)

222.    However, as set forth *supra* ¶¶ 114-216, Defendants have knowingly and/or recklessly misstated and underreported Eletrobras' liabilities in connection with the Bearer Bonds, and have knowingly and/or recklessly made false and/or misleading statements and/or material omissions regarding material deficiencies in Eletrobras' internal controls.

223.    As such, Defendants' statement that Eletrobras is in compliance with the Disclosure Policy is false and/or misleading because Eletrobras has not made a truthful, comprehensive disclosure of all Relevant Information as required by the Disclosure Policy.

## VIII.   ADDITIONAL ALLEGATIONS SUPPORTING SCIENTER

224.    At all relevant times, Defendants knew but failed to disclose and/or recklessly disregarded that the statements referenced in ¶¶ 114-223, *supra*, were materially false and/or misleading and/or omitted material information that Defendants knew or recklessly disregarded was necessary to make such statements not materially false and/or misleading, for the reasons stated *supra*. In addition, such statements were also known by Defendants to be materially false and/or misleading at the time they were made, for the reasons outlined above and for the following reasons, among others.

225.    Eletrobras is a party to the very lawsuits that Defendants falsely cite and misconstrue.

226.    In 2015, the PwC Report found that Eagle's claims under the Bearer Bonds were "possible" and that the amount Eagle was seeking under the Bearer Bonds needed to be included in Eletrobras' liabilities. *Supra* ¶ 98. PwC explicitly warned Eletrobras about the serious, adverse consequences that could result from a failure to disclose these significant liabilities. *Id.* Defendants, however, purposefully or recklessly ignored this report.

92

227.    In the Eagle Lawsuit, outlined above, the Court found that there was "probable existence" of the debt under the Bearer Bonds and ordered Eletrobras to pay the amount sought in the complaint within fifteen days of the order. *Supra* ¶ 93.

228.    The AHG Lawsuit (*supra* ¶ 96) also put Eletrobras on notice of the claims against it under the Bearer Bonds.

229.    On April 11, 2016, Eagle sent a notification to Hogan Lovells, which was then assisting with the internal investigation of Eletrobras, alerting it to irregularities on Eletrobras' 2014 and 2015 Form F-20s – specifically, that there was no mention of the diversion of billions of dollars to Eletrobras' controlling shareholders, which was harming Eletrobras' creditors and minority shareholders. On June 20, 2016, Eagle sent a similar notification to KPMG, Eletrobras' independent auditor at that time.

230.    On November 8, 2017, Mr. de Siqiera sent an email to the Public Relations Department at Eletrobras (pr@eletrobras.com) informing Eletrobras of the MPF Investigation and sending a link to the file.

231.    Defendants are well aware of the "inadequate internal controls" over Eletrobras' financial reporting that continue to persist to this day and that continue to allow Defendants to commit fraud on the Company's investors by allowing them to purposely and falsely disclaim liability for the billions of dollars of debt currently outstanding – and growing daily. As noted above, on pages 12-13 of the 2018 Annual Report (Eletrobras' most recent Form 20-F, filed with the SEC on April 30, 2019), Defendants candidly admit:

> **Risks Relating to our Company**
>
> If we do not remedy the material weakness in our internal controls, the reliability of our financial statements may be materially affected.
>
> *   *   *

During the 2018 certification process, **we and our independent auditor conducted independent tests and identified inconsistencies in our internal controls, which resulted in one material weakness included in our 2018 annual report** filed on Form 20-F.

The material weakness identified was:

***As in previous years, we did not maintain adequate controls regarding the preparation of our financial statements and related disclosures. The matters involved:*** (i) insufficient involvement of trained personnel on a timely basis, including at relevant subsidiaries; (ii) ineffective general information technology controls (GITC) regarding management and monitoring of privileged accesses; and (iii) ***ineffective management review and/or processes level controls over the financial reporting*** . . .

232.    What is more, the Individual Defendants in particular were intimately and personally involved in the preparation of the Financial Statements alleged to be materially false and/or misleading above. Specially, the 2018 Annual Report stated that:

**ITEM 15. CONTROLS AND PROCEDURES**

**(a) Disclosure Controls and Procedures**

We carried out an evaluation under the supervision of, and <u>with participation of, our management, including our Chief Executive Officer and Chief Financial Officer</u>, of the effectiveness of the design and operation of our disclosure controls and procedures, including those defined in United States Exchange Act Rule 13a-15e, as of the year ended December 31, 2018. There are inherent limitations to the effectiveness of any system of disclosure controls and procedures, including the possibility of human error and the circumvention or overriding of the controls and procedures. Accordingly, even effective controls and procedures can only provide reasonable assurance of achieving their control objectives.

As a result of this evaluation, *<u>our Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures were not effective as of December 31, 2018, and that the design and operation of our disclosure controls and procedures were not effective to provide reasonable assurance that all material information relating to our company was reported as required because material weaknesses in the current operation of our internal control over financial reporting were identified as described below</u>*.

2018 Annual Report, p. 165.

233.    Further, Defendant Presta signed the June 12 and September 2 Market

Announcements, in which Eletrobras acknowledged the 2019 STJ Decision and stated that it would ignore it and continue to report its Compulsory Loan Obligations the same way as before.

234.    Finally, as noted in the August 19, 2019 Market Announcement, on August 12, 2019, Eletrobras' Board of Directors met, received a report from the Coordinator of the Statutory Audit and Risk Committee regarding Eletrobras' intermediate Financial Statements for the period ended June 20, 2019, and then unanimously approved the publication of Eletrobras' intermediate financial statements for the period ended June 30, 2019.

## VIII.   THE IMMINENT PRIVATIZATION AND DEFENDANTS' STATED INTENT TO CONTINUE TO MAKE FALSE AND/OR MISLEADING STATEMENTS AND/OR OMISSIONS OF MATERIAL FACT REGARDING ELETROBRAS' COMPULSORY LOAN OBLIGATIONS

### A.    The Push for Privatization in Brazil

235.    In early 2017, former President Temer announced a sweeping privatization drive, pursuant to which many of Brazil's partially state-owned companies would be fully sold to investors with a goal of the government raising critically-needed revenue and boosting infrastructure investment.  Brazil had been (and still is) in a severe economic crisis for nearly three years and President Temer's administration believed that privatization was the answer to Brazil's problems, as it would raise revenue, increase efficiency, and attract international investment.

236.    To this end, the Temer government announced 57 privatization projects, with the goal of raising U.S. $40 billion in fees and U.S. $13.9 billion in future infrastructure investments. One of the first entries on the list to be sold was Eletrobras, considered one of Brazil's "crown jewels," whose privatization was expected at that time to raise as much as U.S. $6.3 billion.

237.    The Eletrobras privatization did not come to fruition during the Temer administration, likely because of the corruption scandal discussed above that occupied much of the government's attention. In December 2018, however, President-Elect Bolsonaro announced

his own ambitious privatization plan to sell equity interests and grant concessions in over 100 state-owned entities.  As part of this plan a new government agency – the Special Secretariat of Privatizations and Divestments – was created within the Ministry of Economy.

238.    In early 2019 the Secretary of Privatization, Salim Mattar, announced that the government wanted to sell at least U.S. $20 billion in assets of state-owned companies in 2019. As before, Eletrobras is at the top of the list of potential sales. Secretary Matter has also stated publicly that "the vast majority of state-owned companies are corrupt" and for that reason as well he is determined to privatize as many of them as possible and to distance the government from the corrupt executives who manage these entities.

239.    In March 2019, Brazil's Economy Minister, Paulo Roberto Nuno Guedes, stated that the government's focus in the second half of 2019 would be to accelerate privatization. As of May 2019, Brazil's government had privatized approximately U.S. $2.74 billion in state assets since the beginning of the year, and much privatization is imminent.

### B.    Eletrobras' Privatization Is Imminent

240.    As discussed above, the Brazilian government has been planning to privatize Eletrobras since at least 2017 as part of the larger effort by Brazil to sell off government assets in order to rescue its faltering economy.

241.    The Privatization of Eletrobras is (along with other equity positions owned by Brazil) seen as one of the key sources of revenue for the government.  Indeed, it was predicted more recently that the sale of the Brazilian government's stake in Eletrobras could raise as much as R $18 billion (U.S. $4.4 billion).

242.    On August 21, 2017, the Brazilian government proposed a "capital increase," pursuant to which the Government's ownership interest in Eletrobras' common shares would be

diluted, directly or indirectly, from its then-60.4% interest to less than 50%. On January 22, 2018, President Temer presented to the Brazilian Congress legislation for the capital dilution.

243.     In mid-July 2019, Brazilian media reported that the government had internally accelerated the progress of the bill to privatize Eletrobras, in an effort to be able to add the expected proceeds realized from the Privatization to the government's 2019 budget.[39]

244.     On July 31, 2019, Eletrobras was invited by the Minister of Mines and Energy, Bento Costa Lima Leite de Albuquerque, to participate in discussions about the Privatization. Eletrobras was informed by Minister Albuquerque that "in-depth studies were carried out so that the process of privatization of Eletrobras occurs through a capital increase, by public subscription of common shares of Eletrobras or any company resulting from the restructuring process." He further requested that "Eletrobras take the necessary measures regarding the possible impact on the capital market."

245.     The Privatization Plan was presented to President Bolsonaro that day by Minister Guedes and Minister Albuquerque. President Bolsonaro has already approved the plan.

246.     The next step is for the Plan to be sent to the Brazilian National Congress, which is expected to happen later this year, with the goal of having the Privatization approved by early 2020. On August 21, 2019, the Brazilian government announced a list of 17 state-owned companies that will be privatized, and that list again included Eletrobras.

247.     On September 9, 2019, Minister Albuquerque stated that he believed the government could send the Privatization bill to Congress by the end of the month, and that Congress wanted the bill approved by the end of 2019.

---

[39]     Under Brazilian law the approval of the National Congress is required for Eletrobras' privatization.

248.    Based on the details of the expected Plan reported in the media, as well as on a Form 6-K filed by Eletrobras on August 2, 2019, it appears that the Privatization of Eletrobras will occur through the issuance of new shares to the public in order to inject capital into Eletrobras, thereby reducing the government's stake to a minority position.  Most recently, on August 14, 2019, Defendant Ferreira stated during a conference call with analysts and reporters that he expects the government to privatize Eletrobras through a share offering sometime after February 2020.

249.    On information and belief, these new Eletrobras shares will be listed at least in part on the NYSE, because it is where Eletrobras' ADRs already trade, and because the Brazilian government will want to reach a wide pool of American and international investors.

250.    In light of Eletrobras' prior SEC filings and the position it has taken in its 2018 Annual Report, the June 12 and September 2 Market Announcements, and the 2Q19 and Amended 2Q19 Marketletters, it is obvious that Defendants will continue to disavow Eletrobras' liability under the Bearer Bonds and misrepresent Eletrobras' liability under the Compulsory Loan Credits in any prospectus or other documents that they will file with the SEC in conjunction with the upcoming Privatization.  In other words, on information and belief, *Eletrobras intends to offer billions of dollars of stock of stock for sale on the NYSE without disclosing that it has liability under the Bearer Bonds of more than U.S. $5.15 billion*. If this offering is allowed to proceed unabated, Defendants will also continue to misrepresent and underreport Eletrobras' liabilities in connection with the Compulsory Loan Obligations.

251.    Indeed, earlier this year, on May 22, 2019, Eletrobras made a public offering of debentures on the NYSE for approximately U.S. $1.25 billion, in part to finance a U.S. $1 billion debt that was due on July 1, 2019.  In connection with this bond offering Eletrobras did not disclose its liability under the Bearer Bonds to potential investors.

252.     These false and/or misleading statements and/or material omissions made by Defendants that will continue in connection with the upcoming Privatization are harming and will continue to harm American and foreign investors, including Plaintiffs. The possible dilution of shareholders' and debtholders' interests foreseeably caused by allowing such a deficient share registration will only serve to exacerbate Eletrobras' already-fragile financial situation.

253.     For example, as disclosed in Eletrobras' most recent 2018 Annual Report, when the Privatization occurs and the government ceases to own more than 50% of the Company, under Eletrobras' outstanding bonds it will be required to make an offer to purchase the bonds at a price equal to 101% of their principal amount plus accrued and unpaid interest. (2018 Annual Report, p. 19.) In this instance, Eletrobras will not have sufficient financial resources to make the change of control offer under the bonds, which could lead to an acceleration of the bonds, which in turn could trigger cross-default clauses under Eletrobras' outstanding loans. Indeed, as disclosed in the same 20-F, as of December 31, 2018, 74.1% of Eletrobras' debt – totaling R $42.950 billion (or roughly U.S. $11.06 billion) – will mature in the next five years. (*Id.*) Of that, bonds issued by Eletrobras in the international market will mature in 2019 in the principal amount of US $1 billion (R $3.87 billion as of December 31, 2018) and in 2021 in the principal amount of US$ 1.75 billion (R $6.78 billion as of December 31, 2018) alone. (*Id.*) By contrast, in 2018, Eletrobras' entire revenue was just R $24.976 billion (U.S. $6.435 billion), and as of December 31, 2018, the aggregate amount of its outstanding capital stock was just R $31.3 billion (or approximately U.S. $8.065 billion).

254.     What is more, under Brazilian law, if any of Eletrobras' "assets are considered [sic] deemed assets dedicated to providing an essential public service, they will not be available for liquidation and will not be subject to attachment to secure a judgment." (2018 Annual Report at p.

22 (citing Law No. 11,101/05)). Indeed, Eletrobras has stated that it, in fact, "believe[s] that a substantial portion of [its] assets, including [its] generation assets and [its] transmission network, would be deemed by Brazilian courts to be related to providing an essential public service. Accordingly, these assets would not be available for liquidation or attachment to secure a judgment." (*Id.* at 22-23.)  In other words, even if Plaintiffs or other American or foreign investors can secure a judgment against Eletrobras that gives them priority over its other creditors, there is no guarantee that they can recover it – especially not if other creditors are simultaneously seeking the same pool of limited assets owned by Eletrobras that are actually subject to liquidation and/or seizure.

## IX.   <u>FRAUD ON THE MARKET</u>

255.   At all relevant times, the market for Eletrobras' securities was an efficient market for the following reasons, among others:

a. The Company's securities were actively traded in a highly efficient market;

b. As a regulated issuer, the Company filed periodic public reports with the SEC;

c. The Company was covered regularly by securities analysts; and

d. The Company regularly issued press releases that were carried by national news wires. Each of these releases was publicly available and entered the public marketplace.

256.   As a result, the market for the Company's securities promptly digested current information with respect to Eletrobras from all publicly available sources and reflected such information in the price of the Company's securities. Under these circumstances, all purchasers of the Company's securities suffered similar injury and a presumption of reliance applies.

## X.     NO SAFE HARBOR

257.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false and/or the forward-looking statement was authorized and/or approved by an executive officer of Eletrobras who knew that those statements were false when made.

### COUNT I
### (Against all Defendants)

### For Violation of Section 10(b) of the Exchange Act and Rule 10b-5(b)

258.    Plaintiffs incorporate each and every allegation set forth above as if fully set forth herein.

259.    Defendants made false and/or misleading statements of material fact and/or omitted material facts necessary to make the statements made not misleading with respect to Eletrobras' Compulsory Loan Obligations, as set forth above.

260.    Specifically, and as detailed above, the 2018 Annual Report:

a.    Falsely states that the Bearer Bonds are invalid and unenforceable and that Eletrobras has no liability under the Bearer Bonds. The 2018 Annual Report also omits material facts regarding the legal authorities upon which Defendants rely for

these conclusions.

b. Falsely minimizes Eletrobras' obligations under the Compulsory Loan Credits and misrepresents the nature and extent of the Compulsory Loan Credit Lawsuits.

c. Fails to comply with applicable accounting standards and falsely represents that it does so comply.

261.    In addition, the June 12 and September 2 Market Announcements falsely minimize Eletrobras' liabilities under its Compulsory Loan Obligations and misrepresent the nature and extent of the 2019 STJ Decision.

262.    Finally, the 2Q19 and Amended 2Q19 Marketletters likewise falsely minimize Eletrobras' liabilities under its Compulsory Loan Obligations and fail to comply with applicable accounting standards.

263.    Defendants also made false and/or misleading statements of material fact and/or omitted material facts necessary to make the statements made not misleading with respect to Eletrobras' compliance with its Disclosure Policy.  Specifically, as set forth *supra ¶¶* 114-216, Defendants have knowingly and/or recklessly misstated and underreported Eletrobras' liabilities in connection with the Bearer Bonds and the Compulsory Loan Credits, and have knowingly and/or recklessly made false and/or misleading statements and/or material omissions regarding material deficiencies in Eletrobras' internal controls. As such, Defendants' statement that Eletrobras is in compliance with the Disclosure Policy is false and/or misleading because Eletrobras has not made a truthful, comprehensive disclosure of all Relevant Information as required by the Disclosure Policy.

264.    By reason of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5(b).

265.   Further, based on the statements in the June 12 and September 2 Market Announcements that Defendants intend to ignore the 2019 STJ Decision and continue treating the Compulsory Loan Obligations in the same manner going forward, and based on their refusal to amend or otherwise change its Financial Statements in the 2Q19 and Amended 2Q19 Marketletters to reflect the 2019 STJ Decision, unless Defendants are enjoined by the Court, they will continue to make false and/or misleading statements in future SEC filings regarding Eletrobras' liabilities under its Compulsory Loan Obligations in connection with its imminent Privatization.

266.   As a result of the false and/or misleading statements and/or omissions of material facts in the 2018 Annual Report, the June 12 and September 2 Market Announcements, and the 2Q19 and Amended 2Q19 Marketletters (and the anticipated false and/or misleading statements and/or omissions of material facts in future SEC filings in connection with Eletrobras' imminent Privatization), injunctive relief is appropriate.

## COUNT II
**(Against All Defendants)**

### Violations of Section 10(b) of the Exchange Act and Rule 10b-5(a) & (c)

267.   Plaintiffs incorporate each and every allegation set forth above as if fully set forth herein.

268.   Defendants violated Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c) in that they employed devices, schemes and artifices to defraud and engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiffs in connection with their purchases of Eletrobras securities as alleged herein.

269.   Defendants participated in the preparation of and/or disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclosed material facts necessary in order to

make the statements made, in light of the circumstances under which they were made, not misleading.

270.    Defendants individually and together, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct to conceal the truth and/or adverse material information about the business, operations and future prospects of Eletrobras as specified herein.

271.    Defendants had actual knowledge of the misrepresentations and omissions of material fact set forth herein or recklessly disregarded the true facts that were available to them. Defendants' misconduct was engaged in knowingly or with reckless disregard for the truth, and for the purpose and effect of concealing Eletrobras' true financial condition from the investing public and supporting the artificially inflated price of Eletrobras' securities.

272.    As a result of the false and/or misleading statements and/or omissions of material facts in the 2018 Annual Report, the June 12 and September 2 Market Announcements, and the 2Q19 and Amended 2Q19 Marketletters (and the anticipated false and/or misleading statements and/or omissions of material facts in future SEC filings in connection with Eletrobras' imminent Privatization),injunctive relief is appropriate.

### COUNT III
**(Against Defendants Ferreira and Presta)**

### Violations of Section 20(a) of the Exchange Act

273.    Plaintiffs incorporate each and every allegation set forth above as if fully set forth herein.

274.    Individual Defendants Ferreira and Presta acted as controlling persons of Eletrobras within the meaning of Section 20(a) of the Exchange Act, as alleged herein. By virtue of their high-level positions as the Chief Executive Officer and the Chief Financial Officer/Chief Investor

Relations Officer of Eletrobras, respectively, and their participation in and/or awareness of Eletrobras' operations and/or intimate knowledge of the false and/or misleading statements and/or material omissions contained in the 2018 Annual Report, the June 12 and September 2 Market Announcements, and the 2Q19 and Amended 2Q19 Marketletters, each of which was filed with the SEC, Ferreira and Presta had the power to influence and control and did influence and control, directly or indirectly, the decision making of Eletrobras including the content and dissemination of its SEC filings.

275.    Ferreira and Presta were provided with or had unlimited access to copies of the 2018 Annual Report, the June 12 and September 2 Market Announcements, and the 2Q19 and Amended 2Q19 Marketletters, and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued, and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

276.    In particular, Ferreira and Presta had direct and supervisory involvement in the day-to-day operations of Eletrobras, and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same.

277.    In addition, both Ferreira and Presta signed the 2018 Annual Report and the Sarbanes-Oxley Certifications attached as exhibits thereto and Presta signed the June 12 and September 2 Market Announcements and the 2Q19 and Amended 2Q19 Marketletters.

278.    By virtue of the foregoing, Ferreira and Presta have violated Section 20(a) of the Exchange Act.

279.    As a result of the false and/or misleading statements and/or omissions of material facts in the 2018 Annual Report, the June 12 and September 2 Market Announcements, and the

2Q19 and Amended 2Q19 Marketletters (and the anticipated false and/or misleading statements and/or omissions of material facts in future SEC filings in connection with Eletrobras' imminent Privatization),injunctive relief is appropriate.

### COUNT IV
**(Against All Defendants)**

### State Law Negligent Misrepresentation

280.    Plaintiffs incorporate each and every allegation set forth above as if fully set forth herein.

281.    In the 2018 Annual Report, the June 12 and September 2 Market Announcements, and the 2Q19 and Amended 2Q19 Marketletters, Defendants made false and/or misleading statements of material fact and/or omissions of material facts necessary to make the statements made not misleading with respect to Eletrobras' Compulsory Loan Obligations, as set forth above. Each of the Individual Defendants, by virtue of their roles as officers and/or directors, were aware of the misrepresentations or recklessly disregarded such and/or omitted information but failed to correct the misrepresentations or disclose the omitted information.

282.    Specifically, and as detailed above, the 2018 Annual Report:

a.    Falsely states that the Bearer Bonds are invalid and unenforceable and that Eletrobras has no liability under the Bearer Bonds. The 2018 Annual Report also omits material facts regarding the legal authorities upon which Defendants rely for these conclusions.

b.    Falsely minimizes Eletrobras' obligations under the Compulsory Loan Credits and misrepresents the nature and extent of the Compulsory Loan Credit Lawsuits.

c.    Fails to comply with applicable accounting standards and falsely represents that it does so comply.

106

283.    In addition, the June 12 and September 2 Market Announcements falsely minimize Eletrobras' liabilities under its Compulsory Loan Obligations and misrepresent the nature and extent of the 2019 STJ Decision.

284.    Finally, the 2Q19 and Amended 2Q19 Marketletters likewise falsely minimize Eletrobras' liabilities under its Compulsory Loan Obligations and fail to comply with applicable accounting standards.

285.    In the exercise of reasonable care, the Individual Defendants knew or should have known that the 2018 Annual Report, the June 12 and September 2 Market Announcements, and the 2Q19 and Amended 2Q19 Marketletters were materially misleading and/or omitted material facts that are necessary to render them not misleading. Ferreira and Presta were provided with or had unlimited access to copies of statements contained therein the 2018 Annual Report, the June 12 and September 2 Market Announcements, and the 2Q19 and Amended 2Q19 Marketletters and other statements alleged by Plaintiffs to be false and/or misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected. In addition, both Ferreira and Presta signed the 2018 Annual Report and the Sarbanes-Oxley Certifications attached as exhibits thereto and Presta signed the June 12 and September 2 Market Announcements and the 2Q19 and Amended 2Q19 Marketletters.

286.    The omissions and/or false and/or misleading statements in the 2018 Annual Report, the June 12 and September 2 Market Announcements, and the 2Q19 and Amended 2Q19 Marketletters, as well as the Disclosure Policy, are material in that a reasonable investor and/or shareholder would consider them important. In addition, a reasonable investor would view a full and accurate disclosure as significantly altering the "total mix" of information made available in the 2018 Annual Report, the June 12 and September 2 Market Announcements, and the 2Q19 and

Amended 2Q19 Marketletters and in other information reasonably available to shareholders.

287.    By reason of the foregoing Defendants are liable for negligent misrepresentation.

288.    Further, based on the statements in the June 12 and September 2 Market Announcements that Eletrobras intends to ignore the 2019 STJ Decision and continue treating the Compulsory Loan Obligations in the same manner going forward, and based on Defendants' refusal to amend or otherwise change Eletrobras' financial statements in the 2Q19 and Amended 2Q19 Marketletters to reflect the 2019 STJ Decision, unless Defendants are enjoined by the Court, they will continue to make false and/or misleading statements in future SEC filings regarding Eletrobras' liabilities under its Compulsory Loan Obligations in connection with its imminent Privatization.

289.    As a result of the false and/or misleading statements and/or omissions of material facts in the 2018 Annual Report, the June 12 and September 2 Market Announcements, and the 2Q19 and Amended 2Q19 Marketletters (and the anticipated false and/or misleading statements and/or omissions of material facts in future SEC filings in connection with Eletrobras' imminent Privatization), injunctive relief is appropriate.

## COUNT V
### (Against Eletrobras)

### Declaratory Judgment

290.    Plaintiffs incorporate each and every allegation set forth above as if fully set forth herein.

291.    28 U.S.C. § 2201 allows the court to "declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."

292.    As set forth above, the Bearer Bonds were issued pursuant to Law No. 4,156/62 and were approved by the Eletrobras shareholders. The Bearer Bonds were registered in the

appropriate notarial offices prior to their issuance and those registrations have not been cancelled.

293.     Plaintiffs therefore seek a declaratory judgment that the statements made by Defendants' in Eletrobras' 2018 Annual Report regarding the Bearer Bonds being invalid or unenforceable are false and/or misleading.

294.     Plaintiffs further seek a declaratory judgment that the Bearer Bonds are valid and enforceable.

## COUNT VI
### (Against Eletrobras)

### Breach of Contract

295.     Plaintiffs incorporate each and every allegation set forth above as if fully set forth herein.

296.     As set forth above, the Bearer Bonds were issued pursuant to Law No. 4,156/62 and were approved by the Eletrobras shareholders. The Bearer Bonds were registered in the appropriate notarial offices prior to their issuance and those registrations have not been cancelled. As such, the Bearer Bonds are valid and enforceable.

297.     The Bearer Bonds provide that Eletrobras owes the bearer the face value of the Bonds, plus interest.  The exact face value, interest, and redemption period varies depending on the series as set forth above, but the payment obligations are the same for all of the Bearer Bonds.

298.     Plaintiffs have presented the Bearer Bonds to Eletrobras for payment, but Eletrobras has refused to redeem the Bonds.

299.     Plaintiffs have suffered damages as a result of Eletrobras' breach in the form of the unpaid face value of the Bearer Bonds, the unpaid interest on the Bearer Bonds, monetary adjustment, and lost opportunity costs.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for judgment and relief as follows:

A.      The entry of a permanent injunction enjoining Defendants and all persons acting in concert with them from:

1) Continuing to make false and/or misleading statements and/or omitting material facts in Eletrobras' SEC filings and public statements necessary to reveal the truth regarding the Compulsory Loan Obligations, including the validity or enforceability of the Bearer Bonds;

2) Filing a Form 6-K, Form 20-F, Form F-3, or any other documents with the SEC in connection with the upcoming Privatization that contains false and/or misleading statements and/or omits material facts necessary to reveal the truth regarding Eletrobras' Compulsory Loan Obligations, including the validity or enforceability of the Bearer Bonds; and

3) Filing any documents at all with the SEC until Defendants correct the false and/or misleading statements and/or omissions of material facts in Eletrobras' prior SEC filings necessary to reveal the truth regarding Eletrobras' Compulsory Loan Obligations, including the validity or enforceability of the Bearer Bonds.

B.      A declaration that:

1) Defendants' statements in Eletrobras' prior SEC filings regarding Eletrobras' Compulsory Loan Obligations, including the validity or enforceability of the Bearer Bonds, are false and/or misleading and/or omit material facts; and

2) The Bearer Bonds are valid and enforceable obligations.

C.      A judgment against Eletrobras in the amount due under the Bearer Bonds to

Plaintiffs, plus damages.

D.      The costs of this action, including reasonable allowance for Plaintiffs' attorneys'

        and experts' fees; and

E.      Such other and further relief as this Court may deem just and proper.

## **<u>JURY DEMAND</u>**

Plaintiffs demand a trial by jury on all issues so triable.


October 9, 2019

                                        Respectfully submitted,



                                         _/s/ Melissa H. Harris_____
                                        **KAHN SWICK & FOTI, LLC**
                                        Lewis S. Kahn
                                        Michael J. Palestina
                                        Melissa H. Harris
                                        1100 Poydras Street, Suite 3200
                                        New Orleans, LA 70163
                                        Tel.: (504) 455-1400
                                        Fax: (504) 455-1498
                                        E-mail: Lewis.Kahn@ksfcounsel.com
                                        Michael.Palestina@ksfcounsel.com
                                        Melissa.Harris@ksfcounsel.com

                                        *Attorneys for Plaintiffs*